**ARASTRA LIMITED PARTNERSHIP, a limited partnership, Plaintiff,**

v.

**CITY OF PALO ALTO, a Municipal Corporation, Defendant.**

**No. C–72–2305 RHS.**

United States District Court,
N. D. California.

Sept. 15, 1975.

Marvin G. Burns, Fulop, Rolston, Burns & McKittrick, John Petrasich, Beverly Hills, Cal. Robert S. Webber, Burlingame, Cal., for plaintiff.

Robert K. Booth, Jr., City Atty., City of Palo Alto, Palo Alto, Cal., Fred Caploe, Atkinson, Farasyn, Smith & Caploe, Mountain View, Cal., William J. Turner, Jackson, Turner & Mulcare, Ronald Mulcare, Burlingame, Cal., for defendant.

## DECISION

SCHNACKE, District Judge.

### THE NATURE OF THE CASE

This is an action by Arastra Limited Partnership, a California limited partnership ("Plaintiff") against the City of Palo Alto ("Defendant"), for inverse condemnation of Plaintiff's real property by Defendant's actions over a period of time, culminating in Defendant's passage of Municipal Ordinances Nos. 2654 and 2671.

Plaintiff, in its First Amended Complaint for Inverse Condemnation, alleges that Defendant's Ordinance No. 2671 applying the City's Open Space Zoning District Regulations to its property, was the final act in bad faith of Defendant City and constitutes an acquisition, confiscation and taking of Plaintiff's real property located in the City of Palo Alto.

### FINDINGS OF FACTS

Defendant is a municipal corporation, located in the County of Santa Clara, State of California, which possesses powers of eminent domain. Plaintiff is a limited partnership presently having Sunradero, Inc., a corporation, as its general partner, and PLT, Inc., a corporation, as its limited partner. Sunradero, Inc. acquired its partnership interest in the Plaintiff partnership in December of 1967, having purchased the same from Sunset International Petroleum Company. PLT, Inc. acquired its interest in the Plaintiff partnership, on or about March 27, 1969, having purchased

the same from Trinell, a general partnership.

The land which is the subject of dispute herein ("Plaintiff's land" and/or "the subject property") lies within Defendant's political boundaries and consists of 515.3 acres of essentially unimproved land. The subject property is located in an area commonly known as "the Foothills" and more specifically in that portion of the Foothills known as "the lands below the park" and/or "the lower Foothills".

*The Events Leading up to Defendant's Open Space Zoning:*

The current partners of Plaintiff acquired their respective interests in the partnership (which they carry at a book cost of $7,461,610.00) after the subject property was rezoned from REA (1 acre residential lots) to P-C (Planned Community) and a development plan (the "1966 Plan") was approved for the development thereof (as well as for the development of certain adjacent parcels). The 1966 Plan contemplated a 10-acre commercial area and 597 residential lots, of varying sizes, on a total of 659 acres (covering Plaintiff's land and certain adjoining land). In addition, the 659 acres included a 40-acre piece of the subject property which had been set aside, as a part of the aforesaid plan, to be separately sold to the Palo Alto Unified School District and/or independently developed at a later date. As applied to Plaintiff's land, the 1966 Plan called for 553 residential units on approximately 460 residential acres.

After approval of the 1966 Plan and on February 27, 1967, Defendant approved and thereafter constructed an "outlook" in its Foothills Park which created a public vista over and across Plaintiff's land.

Sometime in early 1968, Plaintiff began working on the formulation of a new and different development plan for the subject property, involving more extensive development than that contemplated in the 1966 Plan and, from the time the new plan was first conceived until the date it was formally submitted, discussions were held concerning the same with representatives of Defendant.

In or about December of 1968, Defendant advised Plaintiff that it intended to undertake a study as to the manner in which the entire Foothills should be developed but that it would not create any moratorium upon development during the study.

On May 15, 1969, when Plaintiff's new development plan for the property was in its final stages of preparation, the right to commence construction under the 1966 Plan expired and, from May 15, 1969 to September 14, 1972, Plaintiff's property remained zoned P-C without a specific development plan having been approved. Under the provisions of Defendant's Planned Community District Regulations, land may be developed for any and all uses and to any density or intensity, subject to approval by Defendant's City Council. Prior to November 9, 1970, it was Defendant's policy and intent that the Foothills (exclusive of Foothills Park) be developed. Particularly, at all material times prior to November 9, 1970, it was Defendant's policy and intent that the subject property be developed in accordance with Defendant's Planned Community District Regulations.

On June 2, 1969, Defendant entered into a contract with Livingston & Blayney, for the purpose of conducting a study of the manner and extent to which the Foothills area should be developed.

On June 16, 1969, Defendant's City Council approved a Trails and Paths Plan for the Foothills area that contemplated the acquisition of public easements for hiking and riding trails through portions of Plaintiff's land.

On August 1, 1969, Plaintiff filed an application for approval of a development plan for the subject property (the "1776 Plan") contemplating a residential density of approximately 3.57 housing units per acre (1,776 housing units on 243 acres, a 150,000 square foot com-

mercial site, a 200,000 square foot office-professional complex, an elementary school site and other related public facilities on 24 acres and approximately 250 acres of open space). The 1776 Plan was developed by Plaintiff at a cost in excess of $200,000.00.

On October 29, 1969, Livingston & Blayney delivered the first in a series of reports, pursuant to its aforesaid contract of June 2, 1969. The first Livingston & Blayney report indicated that lands within the Foothills area having average slopes of 15 percent or less were "eminently suitable for residential development"; that lands with average slopes of 16–30 percent were "generally appropriate for residential development, including both single-family and multi-family dwelling types"; that Plaintiff's land, and the lands of Stanford University, were the most suitable for development and that there were no seismic or other physical problems that would inhibit residential development.

On November 14, 1969, Livingston & Blayney rendered a special report to Defendant relating specifically to Plaintiff's 1776 Plan. In substance, Livingston & Blayney's evaluation was that Plaintiff's plan was not as aesthetically pleasing as it could have been but was, in general, a reasonable development proposal for the subject property.

On December 12, 1969, Livingston & Blayney rendered its second report which, again, spoke in encouraging terms for the development of Plaintiff's land.

On January 22, 1970, Plaintiff wrote a letter to Defendant's Planning Commission requesting a final determination on the 1776 Plan and objecting to any further delay in its consideration by Defendant.

On January 26, 1970, Defendant's City Council passed a motion to the effect that the Livingston & Blayney study should include study of "permanent open space on lands that should be acquired to protect the outlook from Foothills Park."

On February 4, 1970, Defendant's Planning Commission held a hearing relating to Plaintiff's 1776 Plan. At the hearing, Defendant's Planning Commission passed a motion requesting, in substance, Plaintiff's comments on the economics and design features that might be involved if the density of its plan were reduced from 1,776 dwelling units "to approximately 1,250 dwelling units or other density the applicant feels appropriate."

On Februray 18, 1970, Plaintiff responded to the aforesaid Planning Commission request by submitting a letter discussing development at a density of 1500–1550 units on the subject property.

On March 16, 1970, Defendant's City Council passed a motion to the effect that consideration of Plaintiff's 1776 Plan be continued until a date following the receipt of Livingston & Blayney's Third Report.

In June of 1970, Livingston & Blayney rendered its Third Report which, at pages 57–60, recommended:

(a) That the lands below the Park, including Plaintiff's land, be purchased by Defendant.

(b) That the City deny approval of all development proposals as to such lands, including Plaintiff's land;

(c) That the City be prepared to purchase the said lands, including Plaintiff's land, when necessary to prevent development;

(d) That the said lands, including Plaintiff's land, be rezoned so as to prohibit more than 1-dwelling unit per 5 acres in order to prevent development prior to acquisition by the City; and

(e) That further study be made on alternative means of acquiring said land and the cost thereof to the City.

Regarding the upper Foothills, Livingston & Blayney recommended that Defendant initiate the creation of a regional park district to acquire such lands for park purposes.

On October 27, 1970, Livingston & Blayney wrote a letter to Defendant

suggesting that the aforesaid recommendations at pages 57–60 of its Third Report be accepted by Defendant and that a further study be conducted in the following areas: the results of public acquisition on City finances; the effects of alternative methods of acquisition on the City tax rates; alternative means of acquiring the area suggested for park expansion; alternative means of acquiring the area suggested for land banking purposes; the refinement of acquisition cost estimates; estimates for maintenance costs upon acquisition; the timing of acquisition necessary to prevent development; and recommendations for zoning and other interim land use regulation.

On November 9, 1970, Defendant's City Council, at open public meeting, voted to accept the aforesaid recommendations of Livingston & Blayney at pages 57–60 of its Third Report and to perform the further studies suggested by Livingston & Blayney, at No. 4 on page 2 of their aforesaid letter of October 27, 1970. Said motion was publicized in local news media, without objection from Defendant, as a decision to purchase the subject property.

On November 16, 1970, in open public meeting, Defendant's City Council unanimously voted to deny approval of Plaintiff's development plan and, at the same meeting, directed its staff to draw up an amendment to the Livingston & Blayney contract to reflect the Council's decision of November 9, 1970. Said motions were publicized in local news media, without objection from Defendant, as being in furtherance of the decision on the part of Defendant to purchase the subject property and the denial of Plaintiff's 1776 Plan was publicized as an act made necessary due to conflict with the intended purchase.

Plaintiff in fact believed that Defendant had decided to purchase its property, in fact believed that the 1776 Plan was denied due to conflict with the intended purchase and, in reliance thereon, Plaintiff made no further attempt to develop

its property although repeated attempts were thereafter made by Plaintiff to induce Defendant to reverse its decision to purchase the subject property.

On January 13, 1971, the contract between Livingston & Blayney and Defendant was amended so as to include the studies suggested by Livingston & Blayney at No. 4 of page 2 of their aforesaid letter of October 27, 1970.

On February 10, 1971, Livingston & Blayney rendered its Fourth Report, continuing the aforesaid studies suggested in its letter of October 27, 1970, pursuant to the aforesaid contract amendment of January 13, 1971.

On February 22, 1971, Defendant's City Council passed a motion announcing, in substance, that it had made a firm policy decision to acquire the lands below the Park for open space, park addition and land banking purposes. Said action was publicized in local news media as reflecting a firm decision on the part of Defendant to purchase the subject property. Defendant made no objection to such publicity nor to any other publicity given to its actions.

On March 2, 1971, Defendant's City Staff held a meeting to organize their efforts towards assembling an acquisition plan relating to the lower Foothills.

Commencing on March 3, 1971, various members of Defendant's City Staff began actively exploring the possibilities of obtaining financial assistance for the proposed Foothills purchase from the State of California and from various federal agencies.

On March 8, 1971, at an open public meeting, Defendant's City Council unanimously passed a motion to the effect that Defendant's General Plan be amended "to reflect Council policy of intent to acquire lands below Foothills Park as expansion to the Park and for open space."

On April 2, 1971, Defendant's City Manager rendered a report to Defendant's City Council, entitled "Preliminary Report on Federal Funding for

Foothills Land Acquisition." Among other things, the said report recommended the filing of a letter of intent with HUD for a financial grant to assist in the contemplated lower Foothills' acquisition. The said report further reflected that the City Staff was then proceeding with development of appraisals for the properties comprising the lower Foothills and that the staff was investigating all alternative methods by which the applicable property interests could be acquired.

On April 5, 1971, Defendant's City Council, at open public meeting, authorized Defendant's staff to file a Letter of Intent with HUD for the purpose of requesting financial assistance in acquiring the lands below the Park for open space purposes.

On April 12, 1971, Defendant's City Manager presented a preliminary budget to Defendant's City Council for the fiscal year 1971–1972, noting therein, under the heading of "Foothills Land Acquisition", that the costs and methods of financing the proposed Foothills acquisition had yet to be determined.

Also on April 12, 1971, Defendant's City Manager advised Defendant's City Council of the need to obtain accurate descriptions of the parcels intended to be acquired.

On April 28, 1971, Defendant's Planning Commission passed Resolution 117, recommending a revision to the City's General Plan to reflect the Council's policy of intent to acquire such lands for open space, conservation and park uses.

Also on April 28, 1971, Defendant's Planning Commission determined that the portions of the lower Foothills that were then zoned as P-C (being Plaintiff's land and one other parcel) should be rezoned to some more restrictive classification and the staff was directed to report back to the Commission with a recommendation of an appropriate zoning consistent with the aforesaid Resolution 117.

On May 3, 1971, Defendant's Director of Planning submitted a Notice of Intent to file application with HUD for a federal open space grant, estimating the acquisition costs at $12,000,000 and reciting the City's intent to construct permanent public riding and hiking trails through the property to be acquired.

Also on May 3, 1971, Defendant's City Council unanimously passed a motion authorizing Defendant's Mayor to write the Santa Clara County Board of Supervisors and Planning Commission requesting that steps be taken at the earliest date to amend the Santa Clara County General Plan to show lands below Foothills Park with an appropriate open space designation to conform to the Palo Alto City Council's adopted policy. Said letter was in fact written on May 5, 1971. On July 28, 1971, and pursuant to said request of Defendant's Mayor, the County of Santa Clara's general Plan was amended to show Plaintiff's land as "Open Space—Public Facilities" and the County resolution effecting said change recites that the same was pursuant to a "declared intention" on the part of Defendant "to acquire said lands for park purposes."

On May 12, 1971, Defendant's Director of Planning and Community Development requested real property appraisals and preliminary title reports for each parcel in the lower Foothills which the Council had earmarked for acquisition.

On May 14, 1971, Defendant received a written report from independent legal counsel on the time schedule for authorization and issuance of general obligation bonds of the City for the purpose of acquiring lower Foothills lands for park purposes.

On May 24, 1971, Defendant's City Council passed a motion to include two additional parcels, including a parcel known as "Country Club West Unit #2", within the boundaries of the lands below Foothills Park which had been designated for acquisition. Plaintiff's

land was one of the parcels designated for acquisition by Defendant City.

On May 24, 1971, Defendant's City Manager advised Defendant's City Council that a moratorium might be necessary on Foothills' development if the staff were forced to act before the monies required for acquisition became available.

On May 26, 1971, Defendant's City Manager submitted a formal public report to Defendant's City Council, stating that "the City Council made a major policy decision to acquire a portion of the Foothills" and attaching a report concerning the availability of City funds for Foothills land purchase.

On June 7, 1971, Defendant's City Council, at open public meeting, amended the City General Plan to designate the Foothills area, including Plaintiff's land, for open space, conservation and park uses. Defendant's General Plan was so amended pursuant to the aforesaid direction of Defendant's City Council that the same be amended "to reflect Council policy of intent to acquire . . . as expansion to the Park and for open space."

On or about June 11, 1971, Defendant obtained preliminary title reports on the various parcels comprising the lower Foothills area, including Plaintiff's parcel, each such report being referenced to "Project 71–98—Lower Foothills Acquisition".

On June 21, 1971, Defendant's City Council unanimously adopted a budget for the fiscal year 1971–1972 which included the sum of $3,334,100 as an appropriation of City funds for "Foothills Land Acquisition".

On June 30, 1971, Defendant executed contracts with Desmond Johnson, MAI, and with Floyd Clevenger, MAI, for appraisals of certain parcels in the lower Foothills, including Plaintiff's land.

On July 15, 1971, Defendant's City Manager delivered a report to the City Council referenced: "Moratorium, Area Southerly of Junipero Serra Freeway," attaching copies of a large display map entitled "Foothills Acquisitions" and bearing the legend: "Areas Proposed For Acquisition". The said report recites that such lands were the parcels which the staff recommended for acquisition.

On July 19, 1971, Defendant adopted Ordinance 2612, establishing a six-month moratorium on development for certain lands below the Park, including Plaintiff's land. The Minutes of said meeting reflect no discussion whatsoever and the only reference to information before the Council at that time is contained in the Agenda heading which refers to the aforesaid City Manager's report by which the aforesaid display map ("Parcels Proposed For Acquisition") had been transmitted to the Council.

On August 4, 1971, Defendant was advised of the aforesaid change in the Santa Clara County General Plan showing Plaintiff's land as "Open Space—Public Facilities" pursuant to Defendant's aforesaid request and, at all times following said change to the present date, Plaintiff's land has been shown on the County General Plan as a proposed regional park, without objection from Defendant.

On August 5, 1971, Defendant's City Manager delivered a report to Defendant's City Council recommending that additional City monies be allocated for Foothills land acquisition.

On August 6, 1971, Defendant's City Manager rendered a report to Defendant's City Council entitled "Foothills Financing Plan" wherein three alternative financing plans were suggested.

On August 9, 1971, Defendant's Property Agent delivered a memorandum to Defendant's City Manager concerning "Project 71–98—Foothills Land Acquisition". Said memo sets forth estimates of values of the parcels proposed to be acquired, including Plaintiff's parcel.

On August 23, 1971, Defendant's City Council passed Ordinance 2619, increasing its City budget appropriations for

"Foothills Land Acquisition" by the sum of $665,900 (from $3,334,100 to $4,000,000).

On August 30, 1971, Defendant's staff concluded that the receipt of federal funds to aid in the purchase of the lower Foothills would be unlikely.

On August 31, 1971, Defendant's staff completed a report which concluded, in part, that, aside from the possibility of using the regulatory powers in bad faith to delay development, zoning could not be used as a means of preventing development in the lower Foothills.

In late August and the first week of September of 1971, Defendant received letters from several of its major taxpayers expressing concern as to the possibility of an increase in the City tax rate resulting from the intended Foothills land purchase.

On September 10, 1971, Defendant's staff completed a report illustrating the varying costs to one of its major taxpayers resulting from different means that might be used to finance the acquisition of the lower Foothills.

In late September, 1971, appraisals for the parcels comprising the lower Foothills area were in their final stages of completion, but Defendant elected to have the same delivered in oral, rather than written, form so as to avoid their public disclosure and possible use by property owners in ensuing negotiations or litigation.

On September 27, 1971, Defendant's staff prepared a map of the lower Foothills entitled, "Project 71–98—Foothills Land Acquisitions," setting forth the property lines of each parcel in the lower Foothills and giving each such parcel a numerical designation. Plaintiff's land was designated as Parcel No. 1.

On October 4, 1971, Defendant's City Council held a closed executive session re Foothills land acquisition, whereat estimated fee values of each parcel in the designated area were discussed, a decision was made not to further seek federal funding, and a decision was made to en-

gage professional assistance to guide the Council in negotiations with the property owners.

In late October of 1971, Defendant engaged Robert C. Moore Investment Company and Arthur Andersen & Co. to gather information from the property owners in the lower Foothills in an attempt to formulate a plan whereby, through a combination of gifts and purchases, the City could acquire the land for the least possible cash outlay acceptable to the property owners.

During the period from November, 1971 through January, 1972, Defendant's City Council continued to meet in private executive sessions, of which no public record was kept, concerning acquisition of the lower Foothills.

On November 8, 1971, Defendant's Director of Planning and Community Development, Louis Fourcroy, wrote a letter stating that the City was endeavoring to preserve the Foothills "in an undeveloped condition" ; that, pursuant to Livingston & Blayney's recommendation that Defendant acquire the lower Foothills parcels and cause a regional park district to acquire the upper Foothills, both Defendant and the County of Santa Clara had amended their respective general plans, that Defendant had made $4,000,000.00 of City funds "available immediately for acquisition purposes", that Defendant was actively pursuing the formation of a regional park district for acquisition of the upper Foothills and that one could "describe the 'fate of the foothills property' as being signed, but not yet sealed and delivered."

In December of 1971, Defendant had a scale model prepared to show parcels in the lower Foothills covered by its "Project 71–98—Lower Foothills Acquisition." The said model was thereafter placed on public display in the foyer of Defendant's City Hall.

On December 13, 1971, Defendant's property agent delivered a status report to Defendant's City Manager concerning "Project 71–98, Foothills Land Acquisition", wherein it was reported, in part,

that acquisition of the Mutual Benefit parcel was to be postponed until after acquisition of Plaintiff's land, that Mutual Benefit held the deed of trust covering Plaintiff's land and that Mutual Benefit was then resigned to the apparent situation that their parcel is now worth one unit per acre."

In January of 1972, Defendant's staff began exploring the possibility of forming a non-profit corporation to acquire the lower Foothills parcels and Fred Caploe, outside counsel, was engaged to assist in the preparation of ordinances to rezone the Foothills to open space.

On February 22, 1972, Defendant's City Council passed a motion adopting the Santa Clara County Local Agency Formation Commission ("LAFCO") Urban Development Definitions, including LAFCO's definition of "permanent open space" which was, in substance: ". . . lands upon which development is to be permanently prohibited for reasons of public health, welfare and safety."

On February 28, 1972, Defendant passed Ordinance 2647, continuing its moratorium on development in the Foothills area for a second six-month period.

On April 7, 1972, Defendant's Director of Planning and Community Development issued a report to the Planning Commission on "Regulation to Preserve Foothills Open Space", which report contained a suggested draft of what ultimately became Ordinance 2654. Said report was the first written indication of any staff effort proposing the use of regulation to preserve open space as opposed to acquisition to preserve open space.

On April 17, 1972, Defendant's City Council adopted an Open Space Element to its General Plan, which contained the statement that "the City has allocated monies for the purchase of open space", under the section dealing with the lower Foothills area. Plaintiff's land was designated as "permanent open space" in the said Open Space Element.

Also on April 17, 1972, Defendant's City Council passed a motion authorizing the Mayor to purchase one of the parcels in the lower Foothills area, to wit: Country Club West Unit #2.

On March 3, 1972, Defendant received information from its appraisers to the effect that Plaintiff's land might be valued at $7,885,000.00 if based on development of 3 units per acre and $5,215,000.00 if based on development at 1 unit per acre.

On May 15, 1972, Defendant's City Council approved Ordinance 2654 for first reading (the O-S Dist. Regs.) and, at the same time, passed a motion which provided:

"A. The City Council recommends that all private land zoned for open space . . . be eligible to receive the benefits of the Williamson Act at the discretion of the property owners;

"B. The City Council direct the Staff reorder its priorities and begin acquisition of the land for, and approve the trails and paths system in the Foothills, in connection with the policies adopted in 1969;

"C. The City Council direct the Staff to indicate a reassessment of the water, gas and sewer assessments that have been levied on the Foothills properties . . . ."

The open space District Regulations were approved by Defendant's City Council without debate and in precisely the same form as presented to the Council by Defendant's Staff.

Also on May 15, 1972, Defendant's City Council rejected a proposed amendment to the motion quoted above that would have provided that the Staff render a report to the Council giving its assessment of the financial impact of the rezoning on representative property owners in the Foothills and advising the Council of possible ways in which the City might ameliorate the financial impact on property owners resulting from the proposed O-S zoning.

On May 19, 1972, Defendant's City Attorney submitted a report to Defendant's City Council dealing with ways in

which to acquire scenic easements. The said report suggests the passing of a resolution containing certain findings which, in substance, are the findings recited in Ordinance 2671 (the open space zoning ordinance).

On May 22, 1972, a meeting was held between representatives of Plaintiff and Defendant wherein Plaintiff advised Defendant that Plaintiff was prepared to sell its land to Defendant or to develop its land in a manner acceptable to Defendant or to agree to some combination of development and sale but that, unless Defendant acted promptly, Plaintiff would be forced to bring an action in inverse condemnation.

On May 24, 1972, Defendant purchased one of the parcels in the lower Foothills, to wit: Country Club West Unit No. 2. Said purchase was made by Defendant upon the belief that development would occur in the absence of purchase and that several of the houses proposed to be developed would be visible from the viewpoints in Defendant's Foothills Park.

On June 5, 1972, Ordinance 2654 was formally adopted. It added "O-S Open Space District Regulations" to the Palo Alto Municipal Code.

The purpose of the regulations was recited to be:

"(a) to protect the public health, safety and welfare; (b) to protect and preserve open space land as a limited and valuable resource; (c) to permit the reasonable use of open space land, while at the same time preserving and protecting its inherent open space characteristics to assure its continued availability for the following: as agricultural land, scenic land, recreation land, conservation or natural resource land; for the containment of urban sprawl and the structuring of urban development, and for the retention of land in its natural or near natural state to protect life and property in the community from the hazards of fire, flood and seismic activity; and (d) to coordinate with and carry out federal, state, regional, county, and city open space plans."

"Open Space Use" was defined as meaning:

"the use of land for

(1) Public recreation

(2) Enjoyment of scenic beauty

(3) Conservation or use of natural resources

(4) Production of food or fiber

(5) Protection of man and his artifacts (buildings, property, etc.)

(6) Containment and structuring of urban development"

The regulations permit, subject to approval of any development, construction or improvements, use only for agriculture, botanical conservatories, outdoor nature laboratories, native wildlife sanctuaries and one family dwellings; in addition, if a use permit were obtained, and subject to a limit on the number of employees or residents resulting, use for communication and utility facilities; educational, charitable, research and philanthropic institutions; guest ranches; and recreational uses including riding academies, clubs, stables, country clubs and golf courses. (By an amendment made after the filing of this action, cemetery use was added, but limited to underground burials, and excluding crematoria.)

The regulations further require (in part) minimum lot area of ten acres; maximum impervious area and building coverage of 3.5 percent; and that all subdivisions into four or more parcels be designed on the cluster principle and be designed to minimize roads, and designed to locate developments on less, rather than more conspicuous areas.

On June 14, 1972, Defendant's Senior Planner wrote a letter stating that the City was following Livingston & Blayney's recommendations as to the purchase of the lower Foothills and the formation of a park district to acquire the upper Foothills; that Defendant had thus far only purchased about 40 acres but that

Defendant still had over $4,000,000.00 remaining in its budget for future purchases.

On June 15, 1972, Defendant's City Manager rendered a written report to Defendant's counsel referring to the Foothills, including Plaintiff's land, as "permanent open space", which term was again defined, in substance, as: " . . . lands upon which development is to be permanently prohibited for reasons of public health, welfare and safety."

On June 26, 1972, Defendant's City Council adopted a Budget for fiscal year 1972–1973 which included an additional appropriation of City money in the sum of $754,000.00 for the "Foothills Land Acquisition Fund", raising the total appropriations for such funds to $4,754,-000.00 (minus $557,975.00 which had been previously expended).

On July 24, 1972, Defendant passed Ordinance No. 2663 adopting Williamson Act regulations for Foothills properties. It was Defendant's intention that the Williamson Act benefits would be automatically available to any property owner who would consent to the restrictions on his land contained in Ordinance No. 2654.

On July 31, 1972, Ordinance 2671 (the open space zoning ordinance) was approved for first reading. At the time of the Council meeting relating thereto, there were requests from the audience that the City hire an appraiser to assess the impact of the proposed zoning on land use and values prior to adopting the same. Defendant did not hire such an appraiser as suggested.

On August 14, 1972, Ordinance 2671 was formally adopted.

On August 17, 1972, Defendant revised certain of the LAFCO planning definitions which it had previously adopted; among the LAFCO terms and definitions considered for revision but *not* revised was the term "Permanent Open Space", defined as lands upon which all development would be prohibited. Said term

and said definition continued to be applied to Plaintiff's land and the term, definition and the application thereof to Plaintiff's land were each in effect re-adopted on August 17, 1972.

On October 10, 1972, Defendant's City Council adopted various resolutions confirming reassessments on Foothills properties relating to utility assessments previously paid by the respective property owners. Such reassessments were made by Defendant in express recognition of the fact that Defendant's rezoning had significantly diminished the use to which the rezoned lands could be put.

Also on October 10, 1972, Defendant passed Ordinance No. 2687 establishing a 200-foot setback along Page Mill and Arastradero Roads, which roads run through and next to Plaintiff's land.

On October 11, 1972, the owners of the Mullen parcel and their counsel met with representatives of Defendant to discuss the possible purchase of said parcel by Defendant. Defendant's City Manager advised those present that the price requested per acre was unrealistic in light of the recent change in zoning.

The plan by which Ordinances 2671 and 2654 were adopted included the condemnation of portions of Plaintiff's land for the purpose of creating public entry through Plaintiff's land by the general public pursuant to Defendant's trails and paths plan. At the request of Defendant, Plaintiff's land has been designated as "permanent open space" on Maps published by LAFCO. At all times from February 22, 1972, until after the present lawsuit had been filed, Defendant's definition of permanent open space was "lands upon which development is to be permanently prohibited for reasons of public health, welfare and safety."

On October 17, 1972, Plaintiff filed a written verified claim with Defendant's City Clerk in the amount of $15,600,000.-00 plus interest thereon at seven percent (7%) per annum from September 14, 1972 until paid. Said claim has been denied.

On November 7, 1972, a regional park district was created for the purpose of acquiring land in the upper Foothills and the district has since commenced to acquire parcels in the upper Foothills.

Following the enactment of Ordinance 2671, Defendant has never initiated any lawsuit in eminent domain to condemn Plaintiff's land, has made no offer to purchase the same from Plaintiff, and now refuses to do either.

This action was commenced on December 20, 1972.

*Defendant's Acts and Their Effect on the Subject Property:*

Plaintiff intended to develop its land in accordance with its P-C zoning. After months of preparation and discussion with representatives of Defendant, Plaintiff submitted a formal application for the development of its property on August 1, 1969. In the ordinary course of events, Plaintiff's plan would have been accepted or rejected by October of 1969. Instead, Defendant submitted the plan for review to Livingston & Blayney who were then studying development in the Foothills generally. Thereafter, Livingston & Blayney were directed to consider whether Defendant should acquire portions of the land to protect the view from Foothills Park and Defendant postponed consideration of Plaintiff's plan until after Phase III of The Livingston & Blayney Report.

During the entire period from August 1, 1969 to November 16, 1970, the provisions of Defendant's P-C regulations and Defendant's decision to forestall action on Plaintiff's plan, effectively prevented Plaintiff from developing its land, due to the need for approval from Defendant and the futility of proposing alternative plans while the 1776 Plan was pending and Defendant was still awaiting Livingston & Blayney's recommendations as to possible purchase of the subject property.

Ultimately, Livingston & Blayney recommended purchase of the entire parcel,

Defendant accepted the recommendation and denied approval of Plaintiff's plan.

Defendant's actions of November 2, November 9 and November 16, 1970 and February 22, 1971 were in substance and effect a decision by Defendant to acquire Plaintiff's land, were intended by Defendant as a public announcement of its intent to acquire Plaintiff's land, were so understood by Defendant's staff, were repeatedly so publicized in local news media, were accepted as such by Plaintiff, by other property owners in the lower Foothills and by the County of Santa Clara. At no time prior to the commencement of this lawsuit did Defendant ever act to rescind its decision to purchase Plaintiff's land, nor did Defendant ever act to dispel the public impression which it had created, i. e., that Plaintiff's land was to be acquired by Defendant for open space purposes.

In the belief that Defendant intended to purchase its property, Plaintiff made no further attempt to develop the same after November of 1970, nor any attempt to sell the property to anyone else and due to the specter of public acquisition created by Defendant, the subject property was unmarketable in that no other person would have been willing to purchase the property for development at any time following Defendant's publicized actions of November of 1970.

In June of 1971, Defendant amended it General Plan to reflect its decision to purchase Plaintiff's property for park expansion and open space and, in July of 1971, the County of Santa Clara was induced by Defendant to amend its General Plan in accordance with Defendant's decision to acquire.

On July 19, 1971, following its decision to purchase the property for open space purposes, Defendant imposed a moratorium preventing development so as to allow itself time to consummate the intended acquisition.

In February of 1972, Defendant imposed a second moratorium on development in the Foothills for an additional

six-month period. Although the second moratorium ordinance suggests in its recitals that it may have been passed to preserve the status quo during a study as to possible rezoning, the activities of Defendant before, during and after the enactment of the second moratorium make it plain that ways in which to accomplish the desired acquisition were the only subject of any study by Defendant.

In summary, Plaintiff intended to develop its land; the land was capable of being developed and free of any hazard that would prevent development; Defendant adopted a public policy that Plaintiff's land be and remain open space, park addition and/or conservation land; and, pursuant to the adopted policy, Defendant prevented development of the land, decided to purchase the land and in fact took all steps necessary to complete the purchase short of actual commencement of eminent domain proceedings.

On April 7, 1972 Defendant's City Council *publicly* received information to the effect that zoning might be a possible means of achieving its "open space objective" and, although Defendant thereafter publicly processed the zoning change through the enactment of Ordinance Nos. 2654 and 2671, Defendant's City Council continued to address itself to the "open space question" in terms of acquisition in a series of closed, unreported "executive sessions".

The only study of the necessity for and consequences of zoning to achieve the open space objective that preceded the enactment of Defendant's open space ordinances was a study directed to ascertaining the *language* employed by other jurisdictions in imposing similar restrictions on land use and that study was made without any reference to, or comparison of, the kinds of land so restricted. Nor was that study before the City Council at the time it voted to adopt the open space ordinances. Although it was known to Defendant in advance that its open space zoning would result

in substantial diminution of property values and would have a substantial financial impact upon the property owners affected, would substantially reduce the ability to put those properties to any economic use, and was all but certain to result in litigation from the affected landowners, there was no prior attempt whatsoever to assess the impact of those ordinances on the properties to be affected and no study or investigation was conducted by anyone associated with Defendant to determine whether or to what extent the open space zoning would leave the landowner with any viable and/or reasonable economic uses for his land.

Although the ordinances suggest on their face a basis for their enactment in the way of "carrying out" State open space policy, the State definitions of "open space land" cannot fairly be said to describe Plaintiff's land and were not considered as applicable to Plaintiff's land by the draftsman of the ordinance.

Although the ordinances suggest on their face a basis for enactment in the way of assuring the continued availability of "agricultural land", the only information before Defendant's City Council at the time it adopted said ordinances was Defendant's own staff analysis showing that Plaintiff's land was not valuable for any agricultural purpose based upon its soil and slope characteristics.

Although the ordinances suggest on their face a basis for their enactment in the way of promoting the use and conservation of valuable natural resources, Defendant readily concedes that Plaintiff's land contains no such resources.

Although the ordinances suggest on their face a basis for their enactment in the way of guarding against possible fire hazards, the only information before Defendant's City Council at the time of their enactment was that the existing fire hazard would be reduced in the event development were permitted.

Although the ordinances on their face suggest a basis for their enactment in

the way of protecting occupants of the land from harm resulting from seismic activity, the only information before Defendant's City Council at the time the same were enacted was that no seismological basis existed for restricting development of Plaintiff's land.

Nor was Plaintiff's land considered by Defendant to be valuable as watershed land, as ground water recharge land, as land needed to maintain flood control and/or as land valuable for the preservation or enhancement of wildlife resources.

In fact, there was no basis at all for the passage of Ordinance Nos. 2654 and 2671 in the way of promoting public health and/or public safety. Defendant's City Council did not have before it any factual basis for the enactment of either the Open Space District Regulations or the Open Space Zoning Ordinance.

The plain and admitted object of the open space ordinances was to achieve the same result, to the full extent possible, as would have been achieved through purchase of the land itself.

The specific boundaries of the land zoned open space coincide precisely with the property lines of the subject parcels as determined by the legal descriptions contained in the Preliminary Title Reports which Defendant received for each parcel. There is no property which is partially within and partially without the open space area in the lower Foothills and there is no rational basis for Defendant's choice of parcels to be included and parcels to be excluded other than the prior decision to acquire those parcels. One of the parcels adjoining Plaintiff's land, having terrain generally similar to that of Plaintiff's land, still retains the P-C zoning that had previously been applied to Plaintiff's land.

Defendant has never formally acted to rescind its policy decisions to acquire the land of November 9, 1970 and February 22, 1971; after Ordinance 2654 had been approved for first reading, Defendant in fact purchased one of the parcels in the subject area; after Ordinance 2654 had been approved by Defendant's City Council, Defendant was still studying ways in which to acquire scenic easements in the Foothills area; after Ordinance 2654 had been enacted, Defendant added an additional $754,000.-00 to the "Foothills Acquisition Fund" in its City Budget; after the enactment of Ordinance 2671, applying the open space district regulations to Plaintiff's property, Defendant re-adopted its definition of "permanent open space" as applied to Plaintiff's land which remained, in substance, "lands upon which development is to be permanently prohibited for reasons of public health, welfare and safety" and, in October of 1972, Defendant met with the owners of one parcel in the Foothills area to discuss the possibility of purchase by Defendant, suggesting that the price previously discussed was no longer realistic in light of the new zoning. Contemporaneously with the enactment of the zoning ordinances themselves, Defendant acted to create utility reassessments and to provide Williamson Act benefits to those of the affected landowners who would consent to the open space restrictions contained in Ordinance Nos. 2654 and 2671—both of the latter actions having been specifically recommended by Livingston & Blayney as part of the recommended plan of acquisition which Defendant's City Council voted to accept on November 9, 1970.

Although Ordinance Nos. 2654 and 2671 purport to permit a variety of land uses, the same are substantially fewer and more restricted than those available under the prior zoning, and none of the uses remaining has any substantial viability and/or economic reasonability when applied to the subject property. Plaintiff produced, by expert testimony, substantial evidence as to the lack of viability and/or economic reasonability of all uses ostensibly permitted when applied to its land. Defendant suggested only that three of the listed uses were economically possible (residential, vineyards and golf courses).

In every instance, Defendant's proposed use for residences or golf courses required a variance, a strained interpretation, an "exception", a "new concept" and/or an exceptionally amenable City Council willing to obvert the clear meaning of an ordinance which it had itself created. One expert's analysis required such devices as easements over fees to create land useage, lot sizes clearly contrary to the explicit ordinance requirements, and specifications substandard to the minimums required by the City for subdivision development. The appraisal of another assumed a development for which there is no precedent in the Bay area, at sales prices which have never before been achieved in the market and the same was made without any data supporting his concept of marketability and/or absorption.

Considering the state and local subdivision requirements and the attendant costs of installing required off-site improvements, it would be impossible to develop the land for residential use in a manner consistent with the O-S restrictions without incurring costs that would exceed the price at which the land so developed could reasonably be expected to sell; nor would anyone attempt such development in light of the capital risked compared to the lack of expected gain.

The golf course appraiser assumed an income stream derived from anticipated fees and rounds of play far in excess of any competitive course. To put the land to any economic use as a golf course, foreign soils would have to be imported, serious irrigating and drainage problems would have to be overcome, and the course would have to achieve the unique ability to draw patrons for a semi-private course in numbers comparable to those achieved by the most popular public (municipal) courses at prices which far exceed those charged by any existing public (municipal) course and in excess of the prices charged by any semi-private course, except Half-Moon Bay, which is exceptionally expensively developed and maintained and which does not enjoy an income equal to its expenses.

The vineyard expert based his opinion on income estimates contemplating the most expensive grapes in the market place with no history of successful, or even attempted, growth in this location, at yields reflecting the highest yields in choice wine areas, based on an investment at the lowest possible price, even risking a clear hazard of disease so as to plant at the least cost.

Only small portions of the subject property are physically capable of being put to any commercial vineyard use due to soil and slope characteristics of the land, and no portion is reasonably adaptable to any economic vineyard use.

Cemetery use, permitted by a later addition to the open space regulations, is not economically reasonable, largely by reason of the exclusion of use for overground burial and crematoria purposes, from which neighboring cemeteries derive a substantial part of their income. In addition, such use would violate the provisions limiting impervious cover.

## DISCUSSION

It must be made plain at the outset that this Court has no intention of making any definitive ruling with respect to the propriety or scope of zoning regulations insofar as they properly seek to preserve the rapidly disappearing open spaces. Indeed, the Supreme Court made it plain in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 5, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), that that Court will not limit the concept of public welfare that may be enhanced by zoning regulations. Comprehensive plans of zoning regulation, based upon some reasonable basis of concern for the public welfare have been recognized as appropriate ever since *Euclid v. Ambler Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The Court there said "Regulations, the wisdom, necessity, and validity of which, as applied to existing con-

ditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive." The same can be said today, another half century after Mr. Justice Sutherland wrote. Validity of a regulation is not to be challenged because it is novel or because it seeks to accomplish purposes not previously thought appropriate. This was recently confirmed by the Ninth Circuit in *Construction Industry Association of Sonoma County v. The City of Petaluma,* 522 F.2d 897 (1975). There the Court sustained an ordinance of the City of Petaluma which limited new development to not more than 500 new dwelling units per year for the express purpose of insuring that development take place in a reasonable, orderly and attractive manner to protect the small town character of the community and to preserve surrounding open space.

■ It is also well settled that regulations otherwise appropriate are not made invalid merely because they cause even a very substantial loss of value to the property affected. *Zahn v. Board of Public Works,* 195 Cal. 497, 234 P. 388 (1925), *affirmed,* 274 U.S. 325, 47 S.Ct. 594, 71 L.Ed. 1074 (1927); *Consolidated Rock Products Co. v. City of Los Angeles,* 57 Cal.2d 515, 20 Cal.Rptr. 638, 370 P.2d 342 (1962); *Euclid v. Ambler Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In *Hadacheck v. Sebastian,* 239 U.S. 394, 405, 36 S.Ct. 143, 60 L.Ed. 348 (1915), zoning was approved even though it caused a reduction in value of over 90 percent.

Care must be taken, however, to distinguish between the power of the community to zone and the power to condemn. Both powers have their source in the authority of the community to act in the public interest, but the nature of the public interest is considered differently depending upon which of the two powers the public authority is purport-

ing to exercise. Clearly, schools and parks are a matter of public concern and establishing them is in the public interest, but one's property may not be taken for either purpose without compensation. If a parcel of property were zoned exclusively for park purposes or exclusively as a school playground, the purported regulation would, in fact, be an exercise in eminent domain. Similarly, if one out of 10,000 acres was taken as a park site, the effect on the value of the remaining property would be infinitesimal when compared with the impact of *Hadacheck, supra,* but nonetheless, the taking would be compensable, even though the Hadacheck loss of value was not. Distinguishing between the exercise of the two powers is not always easy. Indeed, even the Supreme Court can be confused. See *Village of Belle Terre v. Boraas, supra,* 416 U.S. at p. 5, 94 S.Ct. at 1539. There Mr. Justice Douglas, in speaking of *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), considered that that case "refused to limit the concept of public welfare that may be enhanced by zoning regulations." But *Berman* was not a zoning case, it was a condemnation case, and when the Court there said (pp. 32–33, 75 S.Ct. p. 102) "It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled", it was referring to the power of the community to *condemn* for those purposes rather than to accomplish them by uncompensated regulation.

Which of the powers is being used does not necessarily appear from the form in which the community puts its action. Indeed, the entire concept of inverse condemnation arises from circumstances in which harsh regulation unduly invades private property.

The underlying reasons for dealing differently with the two distinct powers have been variously stated. The California Supreme Court in *Holtz v. Superior Court,* 3 Cal.3d 296, 303, 90 Cal.

Rptr. 345, 349, 475 P.2d 441, 445 (1970) said

> "The relevant 'policy' basis of article I, section 14, was succinctly defined in *Clement v. State Reclamation Board* (1950) 35 Cal.2d 628, 642, 220 P.2d 897, 905: 'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to public undertaking.' In other words, the underlying purpose or our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual by making of public improvements' (*Bacich v. Board of Control* (1943) 23 Cal. 2d 343, 350, 144 P.2d 818, 823): 'to socialize the burden . . .—to afford relief to the landowner in cases in which it is unfair to ask him to bear him a burden that should be assumed by society.' (Mandelker, Inverse Condemnation: The Constitutional Limits of Public Responsibility, 1966 Wis.L. Rev. 3, 8)." *

The Supreme Court in *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960), said "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." And, again, in *United States v. Willow River Power Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945), the Court said "The Fifth Amendment . . . undertakes to redistribute certain economic losses inflicted by public improvements so that they will fall upon the public rather than wholly upon those who happen to lie in the path of the project."

Granted, these concepts are not automatically applicable in any specific case. One whose property is affected by an appropriate regulation may well feel that he is bearing an unfair burden. Some courts have held that a regulation which deprives a land of the greater portion of its utility or most of its value, is valid only if compensation is afforded. See, for example, *Dooley v. Town Plan and Zoning Commission*, 151 Conn. 304, 197 A.2d 770 (1964); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The fundamental distinction between eminent domain and regulation was concisely stated in Sackman, "The Impact of Zoning and Eminent Domain Upon Each Other", 1971 Institute on Planning, Zoning and Eminent Domain, 107, 110–111.

> "The distinguishing characteristic between eminent domain and the police power is that the former involves the taking of property because of the need of the property for the public use, while the latter involves the regulation of the property to prevent the use thereof in a manner that is detrimental to the public interest.

> "For the sake of accurate thinking it is well to keep in the mind this fundamental distinction between the two powers in their application to private property. In the exercise of eminent domain, property or an easement therein is taken from the owner and applied to public use because the use or enjoyment of such property or easement therein is beneficial to the public. In the exercise of the police power, the owner is denied the unrestricted use or enjoyment of his property in the interest of the public welfare. Under the police power, the property is not, as a general rule appropriated to another use, but is destroyed or its value impaired, while under the power of eminent domain it is transferred to the state to be enjoyed and used by it as its own."

■ We need not consider the numerous cases which attempt to draw the line of precisely where regulation ceases and an eminent domain taking begins, nor do we consider the ordinance to be standing alone. In the present case, the facts require the conclusion that the open space ordinance was not a bona

fide attempt to impose limitations of the use of the property of the plaintiff, but rather the final step in a program designed to acquire rights over the property for the enjoyment and use of the public in general.

■ The City would have us look no further than the language of the ordinance in determining its validity. Ordinarily, a court may not inquire into the motivation of a legislative body in passing the legislation under consideration. *Soon Hing v. Crowley*, 113 U.S. 703, 5 S.Ct. 730, 28 L.Ed. 1145 (1885); *County of Los Angeles v. Superior Court*, 13 Cal.3d 721, 119 Cal.Rptr. 631, 532 P.2d 495 (1975); *McCarthy v. City of Manhattan Beach*, 41 Cal.2d 879, 264 P.2d 932 (1953). And generally, if there is any reasonable justification for the legislative action, the court may not substitute its judgment for that of the legislative body. If the facts are fairly debatable, a court may not disturb the legislative determination, *Johnston v. City of Claremont*, 49 Cal.2d 826, 323 P.2d 71 (1958); *Lockard v. City of Los Angeles*, 33 Cal.2d 453, 202 P.2d 38 (1949). Courts may, however, appraise the nature and scope of governmental behavior, the prior history, the basis upon which the legislative determination was made, and any other relevant facts, in determining whether the legislation is unreasonable, oppressive or confiscatory. *Kissinger v. City of Los Angeles*, 161 Cal.App.2d 454, 327 P.2d 10 (1958); *Lockard v. City of Los Angeles*, 33 Cal.2d 453, 202 P.2d 38 (1949); *Wilkins v. City of San Bernardino*, 29 Cal.2d 332, 175 P.2d 542 (1946); *Reynolds v. Barrett*, 12 Cal.2d 244, 83 P.2d 29 (1938); *Hurst v. Burlingame*, 207 Cal. 134, 277 P. 308 (1929); *Hagenburger v. City of Los Angeles*, 51 Cal.App.2d 161, 124 P.2d 345 (1942); *Bank of America v. Town of Atherton*, 60 Cal.App.2d 268, 140 P.2d 678 (1943).

When the entire activity of the defendant City is considered, it becomes obvious that the enactment of this ordinance was but the final step in a long series of municipal acts.

After annexing the very substantial Foothills area to the City of Palo Alto, the mid-portion of the new area was acquired as a park to be used only by Palo Alto residents. In the area below the park, the plaintiff owns by far the largest acreage. They and their predecessors have always planned for the development of the land into a combination of residential and commercial properties, and until 1969, the City was cooperating in devising an acceptable development plan. During 1969 and 1970, the concept of preserving the lands below the park in open space became increasingly attractive and in November of 1970, the defendant City unequivocally adopted a policy of acquiring the property for the benefit of the entire community. The objectives of the acquisition were to prevent development of the property below the park, to preserve the open space, and to provide a land bank of city land which could afford sites for public purposes and for controlled private uses.

Until the adoption of the open space ordinance here in dispute there was no doubt on the part of the City's staff, the City Council, the affected property owners or the public, that the land was going to be acquired by the City for the purposes stated. The only open question was how the acquisition was to be accomplished. Over $4,000,000 was budgeted for acquisition, property owners were tentatively contacted, gifts of land were solicited, valuations of the land were made, title reports were obtained, and Federal funds were sought.

By 1972, it began to appear that the costs of acquisition were going to be substantially higher than had originally been hoped. Federal funds were not available, no gifts of land had been generated, the lands values, in the light of the P-C (Planned Community) zoning, would have required expenditures of substantial public funds and some of the larger taxpayers were expressing objections.

While the costs were high, the City remained anxious to prevent development

and to preserve the open space. All development had been foreclosed during the period, but the time was running out within which it could continue to be prevented without some definitive action. The City had adopted a trails and paths program by which they intended to lay out paths through the lower Foothills. The view from Foothills Park could have been intruded upon by development. One of the few acquisitions actually made was of a parcel on which development plans could no longer be delayed and which, had it been developed, would have been visible from the viewpoint in Foothills Park. Development might also have been visible from the existing road through the Foothills. While acquisition now seemed less attractive, the intent to preserve the open space continued. Indeed, the intent to acquire for purposes of preserving open space continues to this day, for no official action has been taken to rescind the purpose to acquire that was announced back in 1970.

When the open space ordinance is examined in this context, it compels the conclusion that the City had the purpose, by way of zoning regulation, to accomplish without expense to the taxpayers all of the benefits it could have received from the acquisition.

The City Council purported to find a series of health and safety factors, that were recited as little more than a formality, in order to justify the open space ordinance. They had no adequate information before them to support any such findings. They found, for example, that the open space ordinance was compelled by the fire hazards of the Foothills. The only information they had before them was information from their own fire chief to the effect that a fire hazard existed in the Foothills only if the Foothills were to remain in their natural condition and that any hazard from fire would be materially reduced by development. Their other findings were equally deficient. While ordinarily, the factual determination made by a city council to justify passage of an ordinance is final and not subject to judicial review, the recitation of imaginary or non-existent hazards can be considered with the other evidence to determine the purpose and effect of the enactment.

Careful scrutiny of the open space district regulations make it clear that they were designed not to control development of the lower Foothills, but rather to prevent it. While the regulations purport to permit residential development on ten-acre sites an analysis of the limitation makes it plain that no such development could ever have taken place. Minimum development costs would have required to be marketed for at least $100,-000 each and to be economically feasible they would have to be sold within about four years. Defendant's experts conceded that they had never known of any such development even being attempted let alone successfully marketed.

It seems obvious that the purchaser of a building site at a cost of $100,000 might plan to construct some rather elaborate structures on his ten-acres, but the ordinance would prohibit that. Only 3½ percent of the site could be covered with impervious construction, so roads, tennis courts, barns, outhouses, swimming pools, etc., would be subject to severe limitations. Nor would the prospective purchaser be allowed to select the most attractive location for his property. The regulations require both clustering of structures, as well as a minimum ten-acre lot size, so even though parcels of land are very large, the houses would be required to be grouped together in sight of one another. Nor could a desirable knoll be used as a building site, because, to protect the view from the park and the roads, sites were required to be unobtrusive. It was certainly totally unrealistic to expect any purchaser to spend such an amount of money to acquire so little freedom to use his property. It must be concluded that the framers of the ordinance had just that in mind. They designed a purported permitted use but surrounded it with so many limitations in order to make it, as

far as they were able, a use that could never be made of the property.

The facts as found indicate that the other uses, purportedly permitted, were equally unrealistic. It is plain that the objective and the effect of the open space regulations was not to control development, but to prevent it.

While the City's method of proceeding may be open to question there can be no doubt of the desirability of their purposes. Open spaces are rapidly disappearing, a sad fact in this all too crowded world. But, however laudable the motive to preserve scenic beauties, the City must act, not by subterfuge, but by law.

California law permits Palo Alto to exercise its right of public domain for all public uses authorized by the state legislature. California Code of Civil Procedure, §§ 1238(3), 1238(2). The acquisition of open spaces and other areas for public use and enjoyment is specifically authorized by Government Code § 6950.

California Government Code § 65912, relating to the enactment of open space zoning ordinances, provides as follows:

> "The Legislature hereby finds and declares that this article is not intended, and shall not be construed, as authorizing the city or county to exercise its power to adopt, amend or repeal an open-space ordinance in a manner which will take or damage private property for public use without the payment of just compensation therefor."

The basic question of law, then is this: If a city with power to do so, decides to acquire property to preserve scenic beauty, open space and the view from a public park and city roads, takes substantially all steps toward doing so, short of payment, leads the public and property owners to believe that the acquisition is inevitable, delays all development of the property while preparing for acquisition, and then, when it has determined that the cost is higher than hoped, on the pretense of protecting against non-existent hazards found to exist without substantial evidence, enacts a zoning ordinance, accomplishing all of the purposes of the acquisition, which purports to allow uses of property which are not economically realistic, with no inquiry as to the economic feasibility of the purported uses, is the resulting loss of value to the property affected compensable? The answer must be "yes".

No case has been found which deals with this precise combination of municipal actions, but in several cases actions, which fall short of the totality of the acts here, have been found sufficient to require compensation. Where the use of land is restricted over an unreasonably long period of time by the threat of condemnation, the loss is compensable. *Drakes Bay Land Co. v. United States*, 424 F.2d 574, 191 Ct.Cl. 389 (1970). To the same effect, *Foster v. Detroit*, D.C., 254 F.Supp. 655, *affirmed*, 405 F.2d 138 (6th Cir. 1968).

A refusal for a long period of time to connect sewer lines so that property may be utilized is confiscatory, *Charles v. Diamond*, 47 A.D.2d 426, 366 N.Y.S.2d 921 (1975). Restrictions on construction designed to eliminate interference with planes flying to and from a nearby airport constitutes a taking, *Peacock v. County of Sacramento*, 271 Cal.App.2d 845, 77 Cal.Rptr. 391 (1969); *Sneed v. County of Riverside*, 218 Cal.App.2d 205, 32 Cal.Rptr. 318 (1963). Deliberately using a restrictive zoning in order to depress the valuation of property intended to be acquired, may in itself require compensation. *People v. Southern Pacific Transportation Co.*, 33 Cal.App.3d 960, 966, 109 Cal.Rptr. 525 (1973).

Reference is also made to *Washington Market Enterprises v. City of Trenton*, 343 A.2d 408 (N.J.Sup.Ct.1975, Dec'd July 28, 1975), in which the circumstances were remarkably close to the present case.

It is somewhat ironic for the defendant to contend that there is an absolute bar to inverse condemnation because there has been no physical invasion of plaintiff's property. Of course, physi-

cal invasion of the property is precisely what the City is attempting to prevent. Their whole objective is to have the property remain unused, undisturbed, and in natural state so that the open space and scenic qualities may be preserved. *Selby Realty Co. v. City of San Buenaventura,* 10 Cal.3d 110, 109 Cal. Rptr. 799, 514 P.2d 111 (1973), is cited for the proposition that the absence of physical invasion precludes compensation. The holding in *Selby* (10 Cal.3d p. 119, 109 Cal.Rptr. p. 805, 514 P.2d p. 117) was in fact as follows:

> "In order to state a cause of action for inverse condemnation, there must be an invasion *or an appropriation of some valuable property right* which the landowner possesses and the invasion or appropriation must directly and specifically affect the landowner to his injury." (Emphasis added.)

There has clearly been the appropriation of a valuable property right of the plaintiff in the present circumstances, whether the taking be deemed a scenic easement, an open space easement, or something different.

The next question is what relief shall be afforded.

Considered narrowly, the damages here might be computed solely upon the basis of the easements constructively acquired by the City and the losses resulting. This, however, would leave the parties in intolerable positions. The City would have paid out amounts which well could approach the full value of fee title but would have no title. The plaintiff, on the other hand, would have title but little more.

 Relief in such a matter should be framed as equitably as possible, considering the position of both parties. The original plan of the City was to acquire the fee; it has never abandoned its purpose to do so. Requiring it to carry out that purpose would serve the interest of both parties. The City with fee title could deal with the entire property in any fashion that public purposes required, including its original concept of land banking some portion of the land for future controlled development. Plaintiff on the other hand would be fully compensated for its property without being left with a naked fee that could well be a liability rather than an asset. Accordingly, it will be held that the measure of plaintiff's damages shall be the fair market value of the fee title on the effective date of the Open Space Ordinance, and it will be further ordered that, concurrently with payment therefor, plaintiff shall convey such fee title to the City.

The sole remaining question is whether, at the trial to determine fair market value, the Court may decide as a matter of law the density to which the property might probably have been permitted to be developed, had not the taking intervened, or whether that is a question of fact to be decided by the jury. It would appear that this determination, just as all other facts affecting compensation, must be left to the jury, *People v. Stevenson,* 190 Cal.App.2d 103, 11 Cal.Rptr. 675 (1949). The Court has, however, already heard what may well be all of the evidence which will bear upon this issue. On the present record, the Court would be constrained to find that there is no evidence which would support a jury finding that development would probably have been permitted to an intensity in excess of 1,250 residential units, plus office and commercial structures, all subject to the then requirements of the P-C (Planned Community) zoning requirements.

A pretrial conference will be held at 11:30 a. m. on Friday, October 31, 1975, at which time a date for further trial will be fixed.