Maryclaire **KOPETZKE** et al.,
Plaintiffs,

v.

**COUNTY OF SAN MATEO**, acting By and
Through the **BOARD OF SUPER-
VISORS**, Defendant.

No. C–74–0858 WHO.

United States District Court,
N. D. California.

May 12, 1975.

James M. Berg, Fitzgerald, Johnson &
Berg, San Francisco, Cal., Harlan K.
Veal, Truce, Veal & Jackson, San Carlos,
Cal., for plaintiffs.

Keith C. Sorenson, Dist. Atty., Henry
A. Dietz, Asst. Dist. Atty., Redwood
City, Cal., for defendants.

## OPINION

ORRICK, District Judge.

This is an inverse condemnation ac-
tion instituted by plaintiffs to redress an
alleged taking of their real property by

defendant County of San Mateo ("the County") without just compensation in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States. The trial was bifurcated, and the issue of liability was tried to the Court sitting without a jury on April 8 and 9, 1975. The Court having received oral and documentary evidence introduced by the parties at trial, and having duly considered said evidence and the points of law and authorities cited in the trial briefs of the parties, and having heard all the arguments of counsel, and being fully advised in the premises, now finds for the reasons hereinafter set forth that defendants are not liable.

## I. FACTS

Plaintiffs' properties are located in the County in the "Riviera Ocean Villa" tract north of Half Moon Bay in the vicinity of Seal Cove and Montara Beach. The subject properties are vacant lots in an existing subdivision in which several residential dwellings currently stand. The properties sit on a high bluff above the ocean, lying between the ocean and a thoroughfare known as Ocean Boulevard.

The present controversy stems from actions taken by the Board of Supervisors ("the Board") of the County beginning on or before August, 1971, regarding the issuance of building permits in the Moss Beach-Seal Cove coastal area.

In August, 1971, in the course of a mapping project in the County, representatives of the United States Geological Survey concluded that there was significant soil instability in the Moss Beach-Seal Cove area. This information was presented to the Board on August 10, 1971, whereupon the Board issued a minute order that a thirty-day moratorium be imposed on the issuance of building permits in that area, pending a report from the County Engineer. Subsequently, the Board, by resolution, extended the freeze on building permits

and commissioned a geologic engineering investigation of the area by F. Beach Leighton and Associates, Inc.

The investigation was made, and a final report, known as the "Leighton Report", was presented to the Board in late October, 1971. The report divided the area into four zones of soil instability, "Zone One" being the most unstable, and "Zone Four" being the most stable of the soil condition categories. All of the properties of the plaintiffs were designated "Zone One".

On October 28, 1971, by resolution, the Board extended the freeze on building permits to November 16, 1971, set a public hearing to consider the Leighton Report on November 16, provided for notice of the meeting to all property owners in the area as well as to the press, and provided for the furnishing of copies of the Leighton Report to the public and the press.

At the close of the public hearing on November 16, 1971, the Board adopted a resolution whereby the freeze on building permits was released, and certain conditions were imposed instead on the granting of building permits in the area. Those conditions made approval of permit applications subject to the conclusions and recommendations of the Leighton Report, and required in addition the furnishing of a professional geologic soils report by the applicant at his expense showing that the specific site for the building permit was safe, or could be made safe, for building thereon. Certain lands, including the entire tract in which plaintiffs' properties are located, were explicitly designated as subject to these conditions. The building official evaluating such individual geologic reports was directed to consider the Leighton Report and other competent reports available to him, and to demand further proof of safety if he deemed it necessary. The Board further directed that copies of the November 16, 1971, resolution be filed with the Recorder's Office, and sent to all title companies doing business in the County.

Months later, on August 8, 1972, the November 16 resolution was revoked, and a new set of conditions for building permits in the subject area was established. These conditions required consideration of the Leighton Report and any other subsequent reports compiled by competent engineering geologists, in considering the granting of permit applications. The August 8 resolution also contained a statement that permits would not be unreasonably withheld. A provision for notification of land title companies was also included. This resolution has continued in effect to the present time. Current policy is to advise applicants for building permits that a soils report prepared by a licensed geologist will be necessary.

Plaintiffs have presented considerable evidence, largely unrebutted by the defendants, showing that the effect of the Board's actions was to render plaintiffs' properties unmarketable in a practical sense.[1] The costs of meeting the requirements for obtaining a building permit were estimated to be so prohibitive, compared to the value of the sites themselves,[2] that prospective purchasers would simply look elsewhere for property. Some evidence was presented to show, moreover, that even should a property owner invest in the required soils studies, a building permit might still be denied. Consequently, property owners and realtors in the area were of the opinion that seeking a building permit

to construct a residence on any lot within the area designated "Zone One" by the Leighton Report would be a futile act. In fact, no building permits have been granted within "Zone One" since August, 1971,[3] although several have been granted within "Zone Two".

It is this loss of marketability which plaintiffs identify as the "taking" for which just compensation is due. The loss is alternately characterized as a "blight" or "stigma" upon the property, and as a cloud upon title. The acts of the County which constitute the alleged "taking" are the freeze and subsequent restrictions upon the issuance of building permits, and the adoption of the Leighton Report itself, with its attendant publicity.[4]

Plaintiffs produced considerable evidence of the existence of the Fitzgerald Marine Reserve, a state refuge for marine life, along the coast directly adjacent to plaintiffs' properties, extending from the bottom of the bluff out 1,000 feet into the ocean. It was shown that the concept plan for the Marine Reserve was still subject to change, and that some condemnation had already been undertaken pursuant to the County's acquisition program for the Marine Reserve. Plaintiffs' properties, however, are not located within the area currently proposed for inclusion in the Marine Reserve. Moreover, John Brook, Director of the County's Parks and Recreation Department and one of the originators

---

1. Ted M. Rossi, a real estate agent, and Floyd Clevenger, a real estate appraiser, each testified that in his opinion the properties were unmarketable, that a person informed of the history of restrictions on building since 1971 would not buy such property, and that financing for such property would be difficult to obtain.

2. Floyd Clevenger estimated that a 10,000 square foot lot in the area of the subject properties would normally sell for $15,000. He estimated the cost of the necessary geologic studies for obtaining a building permit as at least an additional $15,000. Charles McCandless, a "Zone One" property owner not a plaintiff here, told the Court that a soils investigation done on his property had

resulted in a recommendation that an additional $10,000 to $30,000 of further investigation should be done.

3. No permits have been denied in "Zone One" since 1971 either. Since no record of applications for permits is kept unless the application is carried through to completion, it is not known how many applications, if any, were made but subsequently abandoned.

4. In this regard, plaintiffs have shown that although six or seven areas of geologic instability have been identified in the County, the Seal Cove-Moss Beach area is the only one for which a report such as the Leighton Report has been commissioned and adopted by the County.

of the concept plan for the Marine Reserve, stated unequivocally that inclusion of plaintiffs' properties in the Marine Reserve would be of no benefit to the County, since the 100 foot high bluff there was itself a sufficient barrier to access into the refuge. In short, to the extent that the threat of condemnation may enter into plaintiffs' theory of a "taking" here, plaintiffs have failed to prove the existence of such a threat.

## II. QUESTIONS OF LAW

Two major questions of law are raised by the parties on these facts. First, the threshold question put by defendant County as to whether the Court has jurisdiction, and, second, the ultimate question as to whether the County, acting through the Board and its employees, took plaintiffs' private property for public use without just compensation within the meaning of the Fifth Amendment to the Constitution of the United States.

### A. Does the Court Have Jurisdiction?

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331(a), and plaintiffs each allege an amount in controversy of over $10,000. Defendants have challenged jurisdiction on two grounds: first, that an action against a county will not lie under 28 U.S.C. § 1331 and, second, that plaintiffs have failed to exhaust their available administrative remedies in that they have never applied for a building permit since the time the acts first alleged in the complaint occurred. Neither argument is persuasive.

■ Whether a county may be sued under 28 U.S.C. § 1331, given that it may not be sued under 42 U.S.C. § 1983 and 28 U.S.C. § 1343, is an interesting question as yet not addressed directly by higher federal courts. However, Judge Renfrew of this Court has thoroughly considered the problem (as to a municipality rather than a county) and concluded that suit may be brought under

Section 1331 so long as there is a clear showing of the requisite amount in controversy. *Dahl v. City of Palo Alto,* 372 F.Supp. 647 (N.D.Cal.1974). His scholarly opinion is controlling here.

■■ Exhaustion of state administrative remedies is not a mandatory prerequisite to bringing suit against a state entity in federal court when the administrative application would be a futile act. *Houghton v. Shafer,* 392 U.S. 639, 640, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); *King v. Smith,* 392 U.S. 309, 312, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Moreover, the injury complained of here is not the denial of a building permit, it is the loss of marketability of plaintiffs' properties. Cf. *Sneed v. County of Riverside,* 218 Cal. App.2d 205, 212, 32 Cal.Rptr. 318 (1963).

### B. Did the County Take Plaintiffs' Private Property for Public Use?

■ There remains the question whether the County took plaintiffs' private property for public use. I hold, for reasons set forth below, that the actions of the Board in adopting the Leighton Report and imposing soils report requirements on the coastal areas including plaintiffs' properties, constituted a valid exercise of the police power, and did not result in a taking of private property for public use for which just compensation is due under the Fifth Amendment.

The Board's actions were taken to protect the public health, safety and welfare, upon the information that soil instability in the coastal area could present a danger to both life and property. Such actions fall squarely within the police power of the Board to regulate land use for the protection of the public, so long as the actions taken are reasonably necessary and not unduly oppressive. *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 595, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). If those conditions are met, and the exercise of police power

is therefore valid, the resulting losses of property value are simply *damnum absque injuria.* cf. *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915).

In determining the reasonability of the Board's actions, this Court does not pass upon the accuracy or validity of the conclusions of the Leighton Report or any other geologic report, nor the wisdom of the Board in adopting or acting on the basis of such reports. As Chief Justice Hughes made abundantly clear in *Sproles v. Binford,* 286 U.S. 374, 388–389, 52 S.Ct. 581, 76 L.Ed. 1167 (1932), the Court may not substitute its own judgment for that of a legislative body when the subject lies within the police power of the County, and the reasonability of the legislative action is at the least fairly debatable. The reasonability of the Board's reliance on the technical reports is clearly debatable enough a question to take it outside the jurisdiction of the Court.

■ What remains for determination, therefore, is whether the restrictions imposed by the Board were reasonable in light of the legitimate purpose to be accomplished. As Mr. Justice Holmes observed in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922):

"The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking * * *."

Yet, what constitutes going "too far" depends upon the purpose of the regulation, as well as the degree of loss it inflicts upon the property owner. Even a relatively mild restriction may be invalid if it exceeds the limits of necessity under the circumstances. See, *Westwood Forest Estates, Inc. v. Village of So. Nyack,* 23 N.Y.2d 424, 297 N.Y.S.2d 129, 244 N.E.2d 700 (1969). By the same token, although a comparison of property values before and after imposition of the regulation is relevant, it is by no means conclusive in establishing a taking. *Goldblatt v. Town of Hempstead, supra,* 369 U.S. at 594, 82 S.Ct. 987.

■ Plaintiffs have cited numerous cases, primarily decided by California courts under the provisions of the California Constitution, Article I, Section 14,[5] involving restrictions imposed on property by state governmental bodies in the course of precondemnation activities. Showing an intent to condemn is probative of a governmental purpose to commit the subject property to public use or benefit. Such a factor weighs heavily against the presumption that a restriction on land use has as its purpose a valid exercise of police power. *Drakes Bay Land Company v. United States,* 424 F. 2d 574, 191 Ct.Cl. 389, (1970); also see, e. g., *Peacock v. County of Sacramento,* 271 Cal.App.2d 845, 77 Cal.Rptr. 391 (1969).[6] No such factor has been

5. Article I, Section 14, states that "[p]rivate property shall not be taken or damaged for public use without just compensation having first been made. * * *." A key distinction between this provision and the Fifth Amendment, under which the present action arises, is the phrase "or damaged." In reviewing the case law as to the meaning of the "or damaged" phrase in state constitutions, scholars have concluded that its purpose is to compensate for injuries to private property caused by public works, and that the absence of the phrase indicates the will of the people to reserve the right of constructing public improvements without paying property owners for incidental injury caused thereby. 2 *Nichols on Eminent Domain* §

6.38[4]. Although the distinction is of no significance under the facts of the present lawsuit, this Court does not intend to obscure the difference by considering the relevant California authorities here.

6. Other precondemnation cases cited by plaintiffs include *Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972); *Bank of America v. County of Los Angeles,* 270 Cal.App.2d 165, 75 Cal. Rptr. 444 (1969); *Concrete Service Co. v. State, ex rel. Dept. of Public Works,* 274 Cal.App.2d 142, 78 Cal.Rptr. 923 (1969); and *Foster v. Herley,* 330 F.2d 87 (6th Cir. 1964).

shown to exist here, and nowhere is there any indication that the cited cases would have been decided the same absent the condemnation threat. On the contrary, the threat is the key to the "taking".

Plaintiffs have also analogized their situation to those down-zoning cases where a taking has been found. In each such case cited,[7] the reviewing court found that zoning ordinances substantially increasing minimum lot size requirements were motivated by a desire to preserve open space, as well as to limit growth. This Court concurs with the rulings that such goals are properly achieved by exercise of the power of eminent domain, since they are clearly calculated to benefit the public at large, and closely resemble the taking of scenic easements to that end. However, nothing in the record here shows such intentions behind the Board's action in restricting the issuance of building permits, nor even such incidental effects.

Finally, plaintiffs cite several cases in which it was found that property in the approach areas of airports, rendered unfit for residential use by the noise of aircraft, had been taken without compensation in violation of the Fifth Amendment.[8] Present in those cases are both the element of physical invasion of airspace, and the public use factor, which together produce the finding that a taking of private property for public use in the nature of an easement has occurred. Obviously, neither physical invasion nor public use is an issue in the "taking" alleged by plaintiffs here.

Defendants, on the other hand, cite *Selby Realty Co. v. City of San Buena-*

*ventura*, 10 Cal.3d 110, 109 Cal.Rptr. 799, 514 P.2d 111 (1973), for the proposition that denial of a building permit is not grounds for an action in inverse condemnation. To base a decision on that holding, however, would be to beg the question presented here. Plaintiffs are not challenging the denial of a building permit, they are seeking compensation for the loss of marketability of their properties. *Selby* is, therefore, inapplicable.

It is the law in California that a moratorium on issuance of building permits pending adoption of a comprehensive regulatory scheme is a valid exercise of the police power. See *State of California v. Superior Court*, 12 Cal.3d 237, 252–255, 115 Cal.Rptr. 497, 524 P. 2d 1281 (1974) and the cases cited therein. This Court is not aware of any cases arising under the federal constitutional provision which so hold, but there has traditionally been little distinction between federal and state judicial views on the subject of the police power in a land use context.[9] The test of reasonability articulated above is substantially the same for both. Applying it here, in light of the temporary nature of the moratorium imposed, the obvious efforts made to lift it as soon as possible, and the fully justifiable purpose of obtaining an evaluation of the possible dangers presented by coastal soil instability, I find that the freeze on building permits imposed by the Board was clearly a proper exercise of its police power.

Under the same standard, I further find that the subsequent restric-

7. *Aronson v. Town of Sharon*, 346 Mass. 598, 195 N.E.2d 341 (1964); *National Land and Investment Co. v. Kohn*, 419 Pa. 504, 215 A.2d 597 (1965); and *Appeal of Kit-Mar Builders, Inc.*, 439 Pa. 466, 268 A.2d 765 (1970).

8. *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct.

531, 7 L.Ed.2d 585 (1962); and *Sneed v. County of Riverside, supra*.

9. Indeed, both parties to this action have relied so heavily upon California authority in their briefs and oral arguments that the Court confesses itself mystified as to why the action was brought in federal court at all.

tions on the issuance of building permits in the coastal areas designated as geologically unstable by the Leighton Report also constitute a valid exercise of the police power. The Board's concern was clearly safety. Its information was that those areas might well be unsafe for residential use. The Board's duty to guard against hazards to the public presented by California's unique and unpredictable geologic qualities is manifest, particularly in light of the 1973 Alquist-Priolo Act, Cal.Pub.Res.Code §§ 2621–2625, which expressly declares that duty. Moreover, the Board did not preclude outright all further construction; rather, it imposed no more than the minimum restrictions necessary to assure the safety of any future dwellings constructed in the area. Indeed, plaintiffs have suggested no alternate means by which the Board could have achieved that thoroughly legitimate purpose, and the Court can think of none.

Since the exercise of police power was proper, it did not constitute a taking and no compensation is due. *Chicago, Burlington & Quincy Railway Co. v. Illinois*, 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1906). To the extent plaintiffs' losses result from any inherent geologic defects in their properties, the ancient rule of *caveat emptor* must apply. And to the extent their losses result from the regulatory activities of the Board based on the geologic findings of the Leighton Report, they constitute the unequal burden which citizens are frequently called upon to bear in the interests of the general welfare. *Hadacheck v. Sebastian, supra.*

This opinion constitutes the Court's Findings of Fact and Conclusions of Law, and pursuant thereto,

It is hereby ordered that defendants will prepare, serve and file a judgment in accordance with the foregoing opinion, in form approved by plaintiff, on or before May 23, 1975.