**TRUST OF THREE, a partnership, Plaintiff,**

v.

**CITY OF EMERYVILLE and Edward M. Steffani, Defendants.**

**No. C–75–1946 WHO.**

United States District Court, N. D. California.

Jan. 12, 1977.

A. Charles Dell'Airo, Orr, Wendel & Lawlor, Oakland, Cal., for plaintiff.

Austin R. Gibbons, Tinning & Delap, Walnut Creek, Cal., for defendants.

## OPINION AND ORDER

ORRICK, District Judge.

In October, 1973, plaintiff, a partnership known as Trust of Three, bought 22 acres of property zoned "industrial-commercial" in the City of Emeryville, California. Plaintiff now brings an action against the City of Emeryville (City) and Edward M. Steffani[1] claiming an inverse condemnation

---

1. Defendant Steffani simultaneously held a number of positions with the City. His official capacities included Supervisor of Streets (responsible for street paving and cleaning), Har-

of 7.6 acres of said land by the City resulting from the imposition of and the requirement of compliance with allegedly unreasonable and unnecessary requirements before determining whether to issue a use permit for the subject property.[2]

Plaintiff asserts that the way in which the City processed its application for a use permit, including the requirement of sound tests and an environment impact report (EIR), when examined in relation to the City's planning and rehabilitation goals, was unreasonable, rendered plaintiff's property unmarketable, and, thus, resulted in a *de facto* taking without just compensation. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 since the dispute arises under the Fifth and Fourteenth Amendments of the Constitution.

For the reasons hereinafter stated, the Court finds no such inverse condemnation occurred and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, makes its findings of fact and conclusions of law in the following Opinion.

I.

In October, 1973, plaintiff purchased approximately 22 acres of property located in the cities of Emeryville and Oakland from the Shell Oil Corporation, more particularly described as Alameda County Assessor's Parcels Nos. 49–182–15–3, 49–1041–21 and 49–1041–22. Included in this purchase were 7.6 acres of essentially undeveloped land, commonly known as the old Shell parking lot. This parcel is the subject of the current litigation.

The subject property is designated an industrial (I) district pursuant to Chapter 30 of the Code of the Town of Emeryville,

adopted by the City in April, 1964. Under Section 30.21, commercial, business, industrial, manufacturing, and residential uses are permitted in industrial districts. To date there has been no change in the zoning classification of the subject property; it remains described as an industrial (I) district.

In the summer of 1974, plaintiff applied for and received a use permit for 1.5 acres of the subject property in order to continue to lease that portion of the parcel to the Alameda-Contra Costa Transit System for use as a bus storage terminal. The operation involved no maintenance or repair facility. The approval of the use permit, which was issued for three years rather than for the requested five-year term, was supported by findings made by the Emeryville Planning Commission that:

"1. The proposed use is essential and desirable to the public convenience and welfare because an increase in the use of public transportation facilities has required A.C. Transit to purchase additional buses and to provide additional parking space.

2. The proposed use will not adversely affect the existing adjoining uses including: (a) the Hubbard Co. heavy industrial operation, (b) the existing residential development on the north side of 53rd Street, some four hundred feet away, and (c) the High School."

In December, 1974, the Emeryville City Council adopted a revised general plan in compliance with state legislative mandate. The new general plan was enacted after a year and a half of studies conducted by

bor Master (responsible for the operation of the marina), Executive Director of the Redevelopment Agency, Business License Administrator (issues all business licenses in the City), Building Official (issues building permits for construction costing more than $3,000), ex-officio member of the Planning Commission (responsible for preparing agendas, reviewing applications, and presenting factual information and recommendations), and City Works Director (oversees design and construction of city works, including sewer maintenance).

2. Plaintiff originally alleged two additional causes of action based on pendent jurisdiction: one for violation of state eminent domain procedures, Section 1243.1 of the California Code of Civil Procedure, and the other against Steffani individually for conspiracy to interfere with, and for malicious interference with, plaintiff's business. Both claims were dismissed at trial upon motion by plaintiff.

independent planning consultants and land use economists. The adoption of this plan, and the plan itself, in no way changed or affected the extant zoning demarcations within the City. Under the plan, plaintiff's property, including both the old Shell parking lot and the AC Transit yard, is slated for mixed uses which encompass all the uses—commercial, business, industrial, manufacturing, and residential—presently allowed. The plan did suggest increasing the residential base within the City.

On or about July 27, 1975, plaintiff entered into an agreement with Shippers Imperial, a trucking subsidiary of Del Monte Corporation, to lease the balance of the subject land for operation as a truck terminal for the purposes of storing and repairing diesel and other vehicles. The property was well suited to the needs of Shippers Imperial, particularly since the remaining acreage might provide for expansion at a later date. The lease contemplated no major improvements to the property and called for construction only of a small office and dispatching station. Shippers Imperial, facing eviction from its prior location, had a limited time in which to find substitute facilities.

In the spring of 1975, while negotiating the Shippers Imperial lease, plaintiff, through William Hardin, an employee of W. K. Van Bokkelen, a principal of plaintiff, asked defendant Steffani whether a small truck repair facility would be a permissible use on the subject property and received a favorable reply. Later that spring, Shippers Imperial inquired of Steffani whether there would be any problem in locating a truck terminal on the subject parcel. Steffani testified that this was the first mention he had heard of a truck *terminal* and responded that there may be problems with such a use. Steffani further testified that, upon a tour of the old Shippers Imperial site, he indicated to Lawrence Jones, the real estate broker for Shippers Imperial, that a use permit would be required [3] and expressed serious concern about a potential noise problem. Steffani also suggested that acoustic tests be performed both at the old locale and at the subject property to determine whether the noise factor would be objectionable.

Later Hardin and Van Bokkelen met with Steffani to express their displeasure with the use permit requirement. Steffani explained that a use permit was required by City ordinance. At Van Bokkelen's request, Steffani telephoned the Superintendent of Schools, David Baker, whose offices along with the high school abutted the subject property, to see whether the school district would object to the truck terminal use. The answer was "yes".

On June 3, 1975, plaintiff applied to the City Planning Commission for a use permit to operate a trucking terminal. The application was not supported with sound test data. On June 25, 1975, plaintiff's application came before the Planning Commission, but, because plaintiff had not provided

---

3. Ordinance No. 495, amending the Code of the Town of Emeryville by adding Chapter 30, was passed by the City Council on April 27, 1964, and provides in part:

"Section 30.20 *Applicability of Regulations*

The following regulations shall apply in all (I) districts and shall be subject to the provisions of Article 7.

Section 30.21 *Uses Permitted*

(a) All uses permitted in any residential district.

(b) All commercial, business, industrial, public utility and manufacturing uses except uses which are or may become objectionable by reason of the production of noise, offensive odors, dust, smoke, bright light, vibration or involving the handling of explosives or dangerous materials, provided that such objectionable uses may be permitted if a Use Permit is secured in each case, and provided further that the following uses shall be allowed only if a use permit is secured in each case: auto wrecking; acid manufacture; cement, lime, gypsum or plaster of paris manufacture; commercial excavation of earth or building materials; distillation of bones; dumping, disposal, incineration or reduction of garbage, sewage, offal or dead animals; explosives, manufacture or storage; fat rendering; fertilizer manufacture; gas manufacture; glue manufacture; hog raising; iron, junk or rags storage and baling; petroleum refining; smelting of tin, copper, zinc, iron or other ores; stockyards or slaughter of animals; tannery; trailer parks or camps."

sound measurement information, the hearing on the use permit application was continued until a special meeting on July 2, 1975. At this session, the Planning Commission by a two-to-one vote, with two abstentions,[4] granted the use permit upon certain conditions.[5]

Between the June 25 and July 2 Planning Commission meetings, Van Bokkelen met with Steffani to suggest that the City should own the subject property and to express plaintiff's desire to sell the parcel. Steffani replied that a written offer should be presented to the City Council. On July 2, 1975, plaintiff, over the signature of Van Bokkelen, proposed to the City a five-year option to purchase the old Shell parking lot for $2.60 per square foot plus the depreciated value of any improvement made by plaintiff during the option period.

On July 14, 1975, the City Council, acting under Section 29.147 of the City Code, requested that the Planning Commission's ac-

tion in granting the use permit be certified to the Council for review.[6] At a July 21, 1975, meeting, the City Council, at the suggestion of Councilman Eaton, a former zoning administrator, referred the grant of the use permit back to the Planning Commission for findings pursuant to Section 29.144 of the City Code which provides:

"* * * In order to grant any Use Permit the Board of Adjustments shall find that the establishment, maintenance, or operation of the use or building applied for will not, under the circumstances of the particular case, be detrimental to the health, safety, peace, morals, comfort and general welfare of persons residing or working in the neighborhood of such proposed use or be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the City."

Formal findings have not consistently been required by the Planning Commission.

---

4. Commissioners Stoner and Emery abstained from voting on the application because of possible conflicts of interest. Stoner's employer, Judson Steel Co., was negotiating with Shippers Imperial for a site. Emery was an employee of the Emeryville School District whose objection to the proposed use already had been made known.

5. The use permit included the following conditions:
 "1. The operation shall not produce noise exceeding the ambient base level by more than 5 dBA at any time. Should the accepted noise levels be exceeded, the Use Permit will be revoked.
 2. Activity on the proposed site shall be limited to the storage, fueling and minor servicing of truck tractors and trailers.
 3. The speed limit of all vehicles on the site shall be five miles per hour.
 4. All trucks entering and leaving the site shall travel on 53rd Street west of the property. No trucks shall operate on that portion of 53rd St. between the property and San Pablo Avenue.
 5. Redwood slats shall be installed in the existing chain link fence along the 53rd Street and High School sides.
 6. Twelve foot tall trees shall be planted and maintained at 20-ft. intervals along the 53rd Street side of the property and approximately three feet south of the 53rd Street property line."

6. Section 29.147 of the City Code provides:

"(a) If the applicant for a Use Permit is aggrieved by the action of the Board of Adjustments he may, within seven (7) days from the date of the board's decision, appeal in writing to the City Council. Notice of such appeal and of the time and place of hearings thereon shall be given by the City Council to the appellant and said Board.
 (b) Notwithstanding any of the provisions of this Article the City Council may call up for certification to it any action of the Board of Adjustments in granting or denying a Use Permit, but such action must be taken within ten (10) days of the Board's decision. On the certification or appeal, City Council may reverse or affirm, wholly or partly or modify any determination, decision or requirement of the Board of Adjustments or may impose such conditions as the facts may warrant and its decision shall be final. Any hearing may be continued from time to time.
 (c) In order to grant any Use Permit the findings of the City Council shall be set forth in Section 29.144."

Plaintiff argues that the Council's failure to review the Planning Commission decision within ten days rendered the grant of the use permit final. The Court does not accept this contention. The regularly scheduled City Council meeting of July 7, 1975, which would have fallen within the ten-day period, was cancelled due to the Fourth of July holiday and rescheduled for July 14, 1975.

Steffani conferred with the City Attorney about the procedure for formulating the findings. At the City Attorney's suggestion, Steffani asked plaintiff's counsel to draft them.

On August 1, 1975, after considering plaintiff's proposed findings, particularly finding No. 15,[7] defendant Steffani informed plaintiff that additional sound tests would be necessary to support the findings. Steffani specifically pointed out that the sound report already submitted indicated measurements taken during the late afternoon and that noise tests to determine the ambient levels at other times of the day and night were needed.[8] Steffani suggested that the plaintiff submit additional sound analysis before the August 27 Planning Commission meeting. Upon reading plaintiff's proposed findings, Steffani also realized, for the first time, that an EIR might be necessary. During his testimony he said that the possible requirement of an EIR was suggested, in addition, by the City Attorney. Steffani further testified that, in his opinion, there was cause to request an EIR, but, being uncertain and recognizing the controversial nature of the proposed use, he deferred the decision to the Planning Commission. He had the option of issuing a "negative declaration" but declined to do so.[9]

---

7. Proposed finding No. 15 reads:
"That this Commission finds that the establishment, maintenance, and operation of the use and building applied for will not, under the circumstances of this particular case, be detrimental to the health, safety, peace, morals, comfort and general welfare of persons residing or working in the neighborhood of the proposed use or be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the City."
Steffani testified that he was especially worried about the "peace and comfort" requirements.

8. Steffani explained his concern with the potential noise problems in a memorandum dated August 27, 1975, to the Planning Commission:
"It is true that the noises expected from the proposed use will fall within the range suggested for industrial zones, but certainly not for residential areas.
In this particular case, a residential zone is situated directly across the street from the site in question. Because available data presented earlier indicates that expected noises will exceed the criteria proposed for residential areas, I believe it impossible for you to make Finding Number 15, until the applicant has demonstrated that one of the two following conditions is true: one, that the noise produced by the proposed trucking operation would not 'cause the noise level at the property line of any property to exceed the ambient base noise level by more than 5dBA', or, would not produce noises exceeding the criteria established for residential areas in Table IV of the Noise Element.
Data produced so far has only demonstrated that noises generated during certain daytime hours would fall within the criteria proposed for industrial zones. There are no data available for ambient noise levels at all hours of the day, including nighttime. Accordingly, the applicant has not shown that the proposed use would not generate noises exceeding the ambient base noise level at any time, by more than 5dBA. And in repetition, the applicant has not shown that noises expected from the trucking operation would fall within the criteria established for residential areas."

9. On April 7, 1975, the City Council enacted Resolution 75–33 which adopted objectives, criteria, and procedures for preparing environmental impact reports pursuant to Section 21082 of the California Public Resources Code. Section 500 of the Resolution provides:
"(a) Where a project is not exempted by this Resolution or State EIR Guidelines from the requirements of CEQA, the City shall conduct an initial study to determine if the project may have a significant effect on the environment. If any of the effects of a project may have a substantial adverse impact on the environment regardless of whether the overall effect of the project is adverse or beneficial, then an environmental impact report shall be prepared where discretionary governmental action is involved.
(b) If the project is to be carried out by a non-governmental person, the City may require such person to submit data and information which will enable the City to make this determination.
(c) The initial study shall be conducted by the City Engineer or his designee. (15080)"
Section 501 of Resolution 75–33 provides in part:
"(b) In evaluating the significance of the environmental effect of a project, the City Engineer shall consider both primary and secondary consequences. Primary consequences are immediately related to the project (the construction of a new treatment plant may facilitate population growth in a particular area), while secondary consequences are related more to primary consequences than to the project itself (an impact upon the re-

Between the July 21 City Council meeting which referred the plaintiff's application back to the Planning Commission and Steffani's August 1 request for additional sound tests, the plaintiff entered into an agreement with Shippers Imperial to lease an alternate site on Horton Street. At this time, the plaintiff still hoped to obtain a use permit for the subject property and then move Shippers Imperial to that site which was better suited to the needs of the lessee.

On August 27, 1975, the Planning Commission reopened the hearing on plaintiff's application for a use permit, suspended the conditional grant of the permit, and required additional noise tests and an EIR.[10] At this juncture, plaintiff abandoned its application for a use permit, deciding not to comply with the new sound test and EIR requirements, and on September 16, 1975, filed suit in this Court for damages resulting from inverse condemnation. Throughout the trial, defendant Steffani maintained that had plaintiff complied with the sound

test and EIR prerequisites, and had plaintiff corrected any possible noise objections, the Planning Commission probably would have reissued the use permit.

## II.

It has long been established that a municipality possesses broad powers to regulate the land use within its boundaries as long as:

"'* * * the interests of the public * * * require such interference * * and * * * the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive.'" *Goldblatt v. Hempstead,* 369 U.S. 590, 595, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962).

The sound tests and EIR required by the City were imposed on the plaintiff in the belief that the noise created by the proposed trucking activity might disturb the peace and comfort of the adjoining residen-

---

source base, including land, air, water and energy use of the area in question may result from the population growth). (15081)"

Section 502(f) of Resolution 75–33 specifically includes "a substantial detrimental effect * * on ambient noise levels for adjoining areas" in the list of examples of consequences which may have a significant effect on the environment.

As provided in Section 316, the public agency that will carry out or approve a project can issue a "negative declaration" which is a statement that the project, although not categorically exempt from the EIR requirements, would not have a significant effect on the environment and, therefore, does not require an EIR. The procedures for issuing a negative declaration are contained in Section 505 of Resolution 75–33 which provides in part:

"If, after initial study, it is found pursuant to this Article that the proposed project will have no significant effect on the environment due to the circumstances of the project, a negative declaration shall be prepared in accordance with this section.

(a) The City Engineer shall be responsible for preparation of and filing of negative declarations. The City Engineer shall retain for sixty (60) days after the filing of the negative declaration the initial study and other material which establishes the fact of no significant effect. For completing a negative declaration, the Lead Agency shall consult with all Responsible Agencies.

(b) *Contents of negative declarations*: The negative declaration shall be a statement not exceeding one page in length, containing the following information:

(1) A description of the project as proposed, including a description of its location, which shall be identified by county assessor parcel number and street address where available.

(2) A finding that the project will not have a significant effect on the environment, including a brief explanation of reasons for that finding."

Steffani testified that to make a negative declaration would be inconsistent with his opinion that the proposed use might have substantial detrimental effects on the surrounding neighborhood.

Moreover, City Attorney Joseph White advised the Planning Commission that plaintiff's application for the use permit constituted a discretionary project which was not exempt or ministerial in nature. He also explained that, unless the Planning Commission issued a negative declaration, an EIR would be required.

10. Plaintiff challenges the vote on the basis that Commissioners Stoner and Emery, who earlier had disqualified themselves from voting on plaintiff's application, participated in this vote. The decision to impose an EIR requirement carried 6 to 0 with one commission member absent. The votes of Stoner and Emery were not necessary to carry the resolution since, independently of the votes, a quorum of four was present and voted for the EIR.

tial neighborhood and public high school and, as such, were designed to protect the health, safety, and welfare of the Emeryville public. The only question remaining before this Court is whether the City's response to the plaintiff's application for a use permit, especially the prerequisites of noise analyses and an EIR, were reasonably necessary and not unduly oppressive. The Court finds that they were both reasonably necessary and not unduly oppressive. *Cf. Kopetzke v. County of San Mateo Board of Supervisors,* 396 F.Supp. 1004, 1008 (N.D. Cal.1975).

 The denial of a building permit (*see, Selby Realty Co. v. City of San Buenaventura,* 10 Cal.3d 110, 109 Cal.Rptr. 799, 514 P.2d 111 (1973), the adoption of a general plan (*Selby*), a city resolution to acquire land by eminent domain at a future date (*Silva v. City and County of San Francisco,* 87 Cal.App.2d 784, 198 P.2d 78 (1948)), or rezoning which decreases the market value of property (*HFH Ltd. v. Superior Court,* 15 Cal.3d 508, 125 Cal.Rptr. 365, 542 P.2d 237 (1975)) by itself may fail to establish a claim of inverse condemnation. However, as the plaintiff urges, when land use regulation results in a virtual prohibition on use so that the value of the property in question is substantially reduced, if not totally destroyed, evidence exists that a taking has occurred. *See, Goldblatt v. Hempstead, supra,* 369 U.S. at 594, 82 S.Ct. 987.

The essence of plaintiff's claim is that the City's actions, when combined with an officially and unofficially expressed desire for public acquisition of the subject property, establish a taking without just compensation. Plaintiff argues that the facts, when taken as a totality, show a scheme on the part of the City to place plaintiff's land in "deep freeze" until such time as the City is able to purchase the property for residential development. According to the plaintiff's theory, the City's actions have branded the subject property with a bad reputation, rendering it unmarketable. This loss of marketability, plaintiff contends, constitutes the unconstitutional taking. Judge Schnacke, in *Arastra Limited Partnership v.*

*City of Palo Alto,* 401 F.Supp. 962, 979 (N.D.Cal.1975), outlined the proper judicial approach to a similar contention:

" * * * Courts may * * * appraise the nature and scope of governmental behavior, the prior history, the basis upon which the legislative determination was made, and any other relevant facts, in determining whether the legislation is unreasonable, oppressive or confiscatory." (Citations omitted.)

While this Court agrees with Judge Schnacke's approach, it thinks the plaintiff simply has not proved its allegations by a preponderance of the evidence. An examination of the facts adduced at trial will demonstrate this failure.

The following facts are urged by plaintiffs as constituting a scheme by the City to take plaintiff's property:

1. The Planning Commission did not require sound tests nor an EIR before permitting plaintiff to use the alternate Horton Street site for Shippers Imperial's truck terminal;

2. The Planning Commission initially granted the use permit requested for the subject property and the City Council then requested additional testing before granting its final approval;

3. The EIR was requested two months after the use permit application was submitted and was unnecessary in light of the revocation clause contained in the original use permit;

4. The General Plan suggested an increase in residential uses within the City in order to balance the residential population base and the employment base;

5. The General Plan indicated mixed uses for the area in which the subject property is located;

6. David Baker, Superintendent of Schools, opposed use of the subject property as a truck terminal out of concern for the educational environment of the high school and for the need for housing that would generate school age children and avoid possible consolidation with the Oakland School District;

7. Defendant Steffani publicly expressed his opinion that warehouses and truck terminals were not commercial and industrial uses in the best interest of the City because they were low revenue producers;

8. In the opinion of Lawrence Jones, realtor for Shippers Imperial, and David Devoe, real estate consultant for plaintiff, the market value of the subject property had dropped from approximately $850,000 to approximately $250,000 as a result of the uncertainty created by the use permit controversy and present litigation; and

9. The City Redevelopment Agency, on May 4, 1976, passed Resolutions Nos. RD6–76 and RD7–76 authorizing the executive director to explore the possibility of acquiring two separate pieces of property (the Fibreboard and Butner properties) within the Emeryville Community Redevelopment Project Area No. 1.

■ These facts, taken separately and/or together, do not establish a taking by the City. The failure to require sound tests and an EIR at the Horton Street location does not indicate arbitrary or oppressive conduct by the City in relation to the subject property. At least six major industrial facilities surrounded the Horton Street site which, operating around the clock, produced a substantial amount of noise. The addition of the Shippers Imperial terminal to this area would not have a significant impact on the noise level. In contrast, the introduction of the trucking operation to the subject property, a vacant lot bordered by a high school and a residential neighborhood, could detrimentally affect the surrounding environment by inflicting an abnormal and offensive amount of noise.

■ Nor do the individual opinions of Messrs. Baker and Steffani compel a finding of an illegal taking. Both statements reflect legitimate concerns for the overall welfare of the Emeryville community, and, without evidence of improper conduct, do not support plaintiff's claim. The adoption of the General Plan, as noted before, does not constitute a taking. *Selby Realty Co. v.* *City of Buenaventura, supra.* Likewise, the suggestion to increase residential uses within the City without affirmative steps by the City to realize this goal through public acquisition of private property does not indicate an illegal taking. And the proposal of mixed uses for the subject property institutes no change in the zoning regulations affecting plaintiff's land since the "industrial (I) district" designation attached to this parcel already provides for mixed uses.

The testimony of Messrs. Jones and Devoe, both real estate brokers, was not convincing. Their appraisals of the diminished value of the subject property were based upon limited investigations while their conclusions that the parcel is unmarketable were based solely upon the cloud of uncertainty hanging over the subject property as a result of the challenged city actions and instant litigation.

■ The resolutions passed by the Emeryville Development Agency have little bearing, if any, upon this case. Plaintiff argues that the subject property is "conspicuously absent" from the authorizations to explore possible land purchases by the City. While evidence of omissions on the part of a city agency in certain situations might be probative of a government plan to acquire private property (*see, Amen v. City of Dearborn*, 363 F.Supp. 1267 (E.D.Mich.1973), such a negative inference is wholly unwarranted where, as here, there is little or no evidence connecting the specific failure to act with the alleged taking. Plaintiff's argument would be more compelling if it could show, for example, that the Redevelopment Agency had considered authorizing the director to investigate the purchase of the subject property but then declined to do so. No such offer of proof was presented.

Plaintiff's strongest evidence suggestive of a taking is the actions by the Planning Commission and City Council between July 14, 1975, and August 27, 1975: the Council's certification of the Commission's grant of the use permit for review; the Council's request for findings; Steffani's request for additional sound tests to support the findings; and the requirement of an EIR.

Plaintiff argues that these actions were arbitrary and capricious delaying tactics. Plaintiff alleges that the additional sound tests and EIR were completely unnecessary in light of the fact that the prior grant of the permit was specifically conditioned upon plaintiff's proposed use not generating more than 5dBA above the ambient level and gave the City the express power to revoke the permit should plaintiff violate this condition.

At trial two explanations for the requirement of extra sound tests and the EIR were offered. First, defendant Steffani indicated that it would be foolish and unfair both to the City and plaintiff to allow installation of the proposed trucking terminal, involving large capital expenditures for improvements, and then close down the operation for violation of the permit condition, when the possible adverse noise effects could be determined beforehand.

■ Second, Steffani testified that he believed that the preliminary sound tests did not clearly demonstrate that the noise would remain below the established ambient level.[11] In accord with Section 30.21 of the City Code, a permit could not be issued if the "use [might] become objectionable by reason of the production of noise". *See,* Footnote 3, *supra.* Similarly, Steffani believed the City was bound by Section 500 of the City Code to require an EIR where a "project may have a significant effect on the environment". *See,* Footnote 9, *supra.* Whether it would have been wiser, or more fair, for the City to decide the need for an EIR sooner than it did is not a question to be decided by this Court. *See, Kopetzke v. County of San Mateo Board of Supervisors, supra,* 396 F.Supp. at 1008. Given the newness of the EIR ordinance, which was enacted but two months before plaintiff's application, the Court cannot find that the City was delinquent or unreasonable in its handling of this matter. While it is incumbent upon governmental agencies to conduct themselves in an honest and forthright manner, the Court agrees with Justice Frankfurter's often-quoted adage that:

"Wisdom too often never comes, and so one ought not to reject it merely because it comes too late." *Henslee v. Union Planters Nat'l Bank & Trust Co.,* 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949).

Once Steffani and City Attorney Joseph White realized that they had forgotten about the EIR provisions, they would have been derelict in their duties to ignore the mandate of Section 500. The Court finds that Steffani properly deferred the decision to the Planning Commission, and that the Commission was reasonable in its request that an EIR be undertaken.

The cases upon which plaintiff relies are inapposite to this controversy. In *Madison Realty Co. v. City of Detroit,* 315 F.Supp. 367 (E.D.Mich.1970), a taking was found where the city initiated condemnation proceedings as early as 1952 in conjunction with state university expansion and advanced the proceedings until the time it acquired plaintiff's property in 1965. Evidence of an express intent to acquire the property was readily apparent. Among other things, plaintiff there had been alerted in 1957 by the City Housing Commission that its property would be taken within a short period of time, articles and diagrams appeared in the news media indicating the areas subject to city acquisition which encompassed plaintiff's property, and the property was condemned and razed. The published threats of condemnation and admitted city plan to acquire plaintiff's property alone distinguish *Madison Realty Co.* from the instant case. Similarly, in *Amen v. City of Dearborn, supra,* the city had an announced and publicized plan of clearance projects which, when combined with the city's refusal to issue repair and building permits, its efforts to discourage repairs, failure to care for city-owned property, posting of signs on vacant buildings which encouraged vandalism, posting of offers to

11. The maximum ambient level of 5dBA is established by the noise emission standards, Section 4.2 of the City of Emeryville General Plan, adopted by the City Council on August 4, 1975. Resolution 75–67.

buy property, solicitation of sales to the city, lack of municipal initiative to control pollution, and gradual acquisition of property in the area proved an illegal taking.

Also irrelevant to this litigation is *Foster v. City of Detroit,* 254 F.Supp. 655 (E.D. Mich.1966), *aff'd* 405 F.2d 136 (6th Cir. 1968). There, as in *Amen,* the city announced and commenced condemnation procedures against an area including plaintiff's property as part of slum clearance efforts. The city discouraged improvements, actually cleared several blocks, required razing of vandalized buildings, and then abandoned the proceedings after ten years only to recommence new condemnation procedures one year later. And, in *Eyherabide v. United States,* 345 F.2d 565, 170 Ct.Cl. 598 (1965), a temporary taking requiring compensation was found where the Navy mistakenly had considered plaintiff's ranch to be part of an adjoining gunnery range. As a result, plaintiff's improvements were demolished, shells were scattered over his land, plaintiff was unable to retain a caretaker, and the property was subjected to vandalism. This pattern of physical intrusion by the government on private property has no relation to the inferential taking urged by the plaintiff in the case at bar.

Plaintiff cites *Matherson v. Long Island State Park Commission,* 442 F.2d 566 (2d Cir. 1971), for the proposition that governmental harassment and interference with a citizen's use of his property can be so severe as to amount to a taking. Again, the facts of *Matherson* are not at all similar to those in the present case. In *Matherson,* the court reversed a dismissal of the complaint where police allegedly prevented plaintiff's customers from entering the parking lot to plaintiff's night club, blockaded the exit from the highway to plaintiff's establishment, and deliberately and erroneously informed patrons that the club was closed.

Two cases arising in this district are closer to plaintiff's allegations, but still are not analogous to this case. In *Drakes Bay Land Co. v. United States,* 424 F.2d 574, 191 Ct.Cl. 389 (1970), the National Park Service indicated to plaintiff its intent to acquire plaintiff's land for part of the Pt. Reyes National Seashore. Plaintiff, relying on these representations, did not develop its land and asked the government to buy or exchange the property. Although there was no doubt that the government intended to acquire the property at some future date, the government refused plaintiff's requests. As with *Madison* and *Amen,* the explicit intent to acquire the private property distinguishes *Drakes Bay* from the current claim.

Finally, *Arastra Limited Partnership v. City of Palo Alto, supra,* while inferring a taking from a panoply of city actions, does not correspond to the controversy before this Court. Judge Schnacke found that an inverse condemnation had occurred where the city's open space zoning regulations constituted the final step in a plan to acquire the plaintiff's property without compensation. There, the plaintiff, whose land was zoned for planned community development, received initial approval from the City of Palo Alto for a residential development project. A planning firm, hired by the city to study the proposed project, encouraged development of the subject property with only minor qualifications. The city then passed a resolution that permanent open space be acquired on part of the plaintiff's property. The consulting firm, in another report, suggested rezoning the subject property to prevent development prior to acquisition by the city. The city adopted this recommendation which was publicized, without objection, as a decision by the city to purchase the land in question, and later reiterated, in resolutions by the City Council and Planning Commission, its firm policy to acquire the property for open space, park and conservation uses. The city proceeded to actively explore financing possibilities from state and federal agencies, requested appraisal and title reports, negotiated fee values for the parcels involved, allocated public funds for the purchase of the land, and finally rezoned the property to a permanent open space classification which prohibited nearly all residential and commercial development. In contrast to the explicit, affirmative steps taken

by the City of Palo Alto to acquire Arastra's lands, the processing of plaintiff's application for a use permit by the City, including the requirement of sound tests and belated request for an EIR, fails to establish either an intentional or a *de facto* taking of plaintiff's property.

## ORDER

Accordingly, IT IS HEREBY ORDERED that plaintiff take nothing and that judgment be entered for costs of suit in favor of defendants City and Steffani. Defendants shall prepare and lodge with the Court by January 25, 1976, a form of judgment in accordance with the foregoing Opinion in form approved by plaintiff.