**Henry W. BRUNING and Doris S. Bruning, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**No. 66–253–Civ. T.**

United States District Court
M. D. Florida,
Tampa Division.

June 16, 1967.

James F. Kennedy, Jr., of Marshall, Melhorn, Bloch & Belt, Toledo, Ohio, and Worth Dexter, Jr., of Dexter, Conlee & Bissell, Sarasota, Fla., for plaintiffs.

Rodger M. Moore, Trial Atty., Tax Division, Department of Justice, Washington, D. C., for defendant.

## JUDGMENT

LIEB, Chief Judge.

This cause came on for trial before the Court without a jury on the 20th day of March, 1967, and was duly submitted for consideration and decision, and the Court, after due deliberation, rendered its decision, and on the 16th day of June, 1967, made and filed its Findings of Fact, Conclusions of Law, and Order for Judgment. It is therefore, upon consideration,

Ordered and adjudged: .

That the plaintiffs take nothing by their action; that the plaintiffs' Complaint be, and the same is hereby dismissed with prejudice; and that the defendant have and recover its costs of this action to be taxed by the Clerk, for which let execution issue.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this action, which was tried by the Court without a jury, the plaintiffs, Henry W. Bruning and his wife, Doris S. Bruning, seek to recover an alleged overpayment of income taxes and interest paid by them for the calendar year 1957 in the amount of $5,153.75, plus interest as allowed by law.

## FINDINGS OF FACT

1. Plaintiffs are husband and wife and, at the time this suit was commenced, were residents of Sarasota, Florida. At the time of filing their joint income tax return for the year 1957, they were residents of Toledo, Ohio.

2. This action is of a civil nature and arises under the United States Internal Revenue Code and under the statutes and laws of the United States.

3. The taxpayers timely filed their joint income tax return for the calendar year 1957. On or before the date the return was filed, they paid the taxes reflected on the return to be due.

4. On the return referred to in paragraph 3 above, taxpayer [1] reported $15,608.88—his share of the profit from the sale to Socony-Mobil Oil Company, Inc., in 1957, of a parcel of real estate in which he owned an interest—in Schedule D as a long-term capital gain.

5. On August 4, 1961, after audit of the return referred to in paragraph 3 above, additional taxes and interest in the amount of $5,153.75 were timely assessed by the Internal Revenue Service. This amount was paid by the taxpayer on August 15, 1961.

6. On May 8, 1963, the taxpayer filed a timely claim for refund, seeking recovery of the aforesaid $5,153.75, together with interest. This claim for refund was disallowed on September 2, 1964.

7. The taxpayer was, during the year 1957, as well as before and after, in the business of developing and selling real estate. He engaged in such business in his individual capacity and, in addition, through several controlled corporations and as a participant in certain joint ventures.

8. In April, 1954, a partnership known as the Albert J. Corey Company, hereinafter referred to as "Corey", purchased a certain parcel of real estate. Said property contained some 40 acres and was located at the northeast intersection of Byrne and Glendale Roads, in Adams Township, Toledo, Ohio. The same is hereinafter referred to as the "northeast acreage".

9. A rectangular portion of the northeast acreage, including a portion located at the southwest corner thereof and measuring 220 feet by 210 feet in size, was zoned "commercial". Said 220 foot by 210 foot portion is hereinafter referred to as the "subject parcel".

10. The zoning of the balance of the northeast acreage would permit residential usage.

11. In June, 1954, Corey purchased an additional 38 acres of land located at the

---

1. The word "taxpayer" as used hereinafter shall refer to Henry W. Bruning, for his wife, Doris S. Bruning, is only a party because a joint return was filed for 1957.

northwest intersection of Byrne and Glendale Roads, which property is hereinafter referred to as "the northwest acreage".

12. The zoning of the northwest acreage would permit residential usage, but a rectangular portion thereof located at the southeast corner of the northwest acreage was zoned "commercial".

13. On or about July 2, 1954, taxpayer entered into a joint venture agreement with Corey with respect to the northeast and the northwest acreage, and acquired a 40% interest therein. The joint venture held the acreage as an inventory asset for sale to customers in the ordinary course of business and, under the terms of said agreement, taxpayer and Corey agreed to develop, improve, promote, and sell the property as highly restricted residential lots, with the exception of those portions of the acreage zoned for commercial purposes. For the purpose of the agreement, the northeast acreage was valued at $68,500.

14. Taxpayer and Corey retained the services of a surveyor and caused to be prepared certain proposed plat plans for both the northeast and the northwest acreage.

15. Initial plat plans for both the northeast and for the northwest acreage were submitted to the Toledo-Lucas County Plan Commission [2] for approval on September 20, 1954. Thereafter certain other proposed plat plans for both the northeast and for the northwest acreage were submitted to the Plan Commission for approval.

16. The final plat plan for the northwest acreage was approved by the Plan Commission on April 15, 1955, after which the joint venture proceeded to develop, subdivide, and sell off lots therein, including commercial sales. The plat plan for the northwest acreage obviously contemplated that taxpayer and Corey would also plat and develop property hereinafter referred to as the additional

acreage, which adjoined the northwest acreage on the north.

17. The northeast acreage was, on October 14, 1954, and prior to the submission of the last two proposed plat plans with regard thereto, leased by taxpayer and Corey to the Toledo State Hospital for agricultural use during the year 1955, for the nominal rent of some $13 per acre. Said lease was renewed for the year 1956 on October 26, 1955. Taxpayer and Corey, however, were admittedly not holding the northeast acreage for rental purposes.

18. On June 14, 1955, taxpayer and Corey acquired an option upon some additional acreage, hereinafter referred to as the "additional acreage", located to the north and adjacent to the northwest acreage. Said option was exercised on January 17, 1956.

19. On June 28, 1955, taxpayer and Corey entered into an agreement supplementing their joint venture agreement referred to in paragraph 13 above. Under the terms of said supplementary agreement, taxpayer and Corey agreed to develop, improve, promote, and sell the additional acreage as residential lots, but they in nowise altered their agreement of July 2, 1954.

20. On October 23 and 30, 1955, full page newspaper ads were run in the Toledo Blade Newspaper, advertising the Beverly Downs Development, and depicting all three pieces of acreage as included therein.

21. Proposed plat plans for the additional acreage were submitted to the Plan Commission on August 24, 1956, and approved on February 27, 1957, after which the joint venture proceeded to develop, subdivide, and sell off the lots therein.

22. Some time prior to January 28, 1957, the joint venture entered into negotiations with Socony-Mobil Oil Company, Inc., for the sale of the subject parcel. On that date an option to purchase was granted to Socony-Mobil,

2. Hereinafter said commission is referred to as the "Plan Commission."

which gave notice on March 26, 1957, of its intent to exercise the option. The subject parcel was transferred to Socony-Mobil on April 16, 1957, for $55,000 as a service station site.

23. On September 23, 1960, the taxpayer filed a petition against Corey in the Common Pleas Court of Lucas County, Ohio, which petition was subscribed by the taxpayer under oath. Said petition averred that under the joint venture referred to in paragraph 13, herein, the parties had agreed to develop and sell the northeast and northwest acreage as acreage or as platted lots. The petition further averred that the parties thereafter, pursuant to the joint venture agreement, platted the northwest acreage and sold lots therein, and sold off or optioned acreages in the northeast acreage.

24. The activity by the joint venture with regard to all three pieces of acreage demonstrates their intention to exploit the commercial aspects of their property, and to develop and sell in a planned and orderly fashion, first the northwest acreage, and then the additional acreage, holding the northeast acreage for future subdivision and commercial sale after expiration of the lease.

25. The residential development of the northwest and the additional acreage enhanced the value of the northeast acreage, and particularly the subject parcel, as commercial property.

26. The proposed plat plans submitted by the joint venture with regard to the northeast acreage evince an intent to maintain the saleable quality of the subject parcel as commercial property.

27. The joint venture, as announced in the agreement referred to in paragraph 13 herein, demonstrated by its activity with regard to its property, and confirmed by the averments of the petition referred to in paragraph 23 herein was, at the time of the sale of the subject parcel to Socony-Mobil, holding that parcel primarily for sale to customers in the ordinary course of its business.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under Section 1346(a) (1), Title 28, United States Code.

2. Under Section 1221(1) of the Internal Revenue Code of 1954, property loses its privileged status as a capital asset if held by the taxpayer "primarily for sale to customers in the ordinary course of his trade or business." Whether such property is held primarily for sale to customers is a question of fact, and each case must be determined upon the basis of its own peculiar facts. Ackerman v. United States, 335 F.2d 521 (C.A.5th); Thompson v. Commissioner of Internal Revenue, 322 F.2d 122 (C.A. 5th); Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102.

3. It is conceded in the instant case that the joint venturers initially acquired all their property and held the same as inventory assets for sale to customers in the ordinary course of business. Moreover, the evidence demonstrates that the purpose of the venturers was, at the outset, and remained throughout, the sale of their property as subdivision lots with the exception of the portions zoned for commercial usage, which they held for sale commercially. The subject parcel, which was zoned for commercial usage, was sold to Socony-Mobil in 1957 as a service station site. The fact that the northeast acreage, including the subject parcel, was not subdivided does not alter the manner in which the property was being held by the joint venturers, as inventory for sale to customers in the ordinary course of business. Williams v. United States, 329 F. 2d 430 (C.A.5th).

4. The subject parcel, sold by the joint venturers to Socony-Mobil for commercial purposes, was at that time being held by the joint venture primarily for sale to customers in the ordinary course of trade or business. Thus, the applicable law excludes capital gains treatment, and the taxpayer's profit from the sale of the subject parcel is taxable as ordinary income. Friend v. Commissioner

of Internal Revenue, 198 F.2d 285 (C.A. 10th); Thompson v. Commissioner of Internal Revenue, supra; Ackerman v. United States, supra; Malat v. Riddell, supra.

Judgment will be entered in accordance with these Findings of Fact and Conclusions of Law in favor of the defendant, dismissing the taxpayer's complaint with prejudice, and awarding the defendant its costs.