ESTATE OF EILEEN M. KNUDSEN, DECEASED, JOHN G. R. CLEGG, EXECUTOR, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Knudsen v. Commissioner
Docket Nos. 5506-77, 5507-77, 5508-77, 5509-77, 5510-77.
United States Tax Court
T.C. Memo 1980-216; 1980 Tax Ct. Memo LEXIS 365; 40 T.C.M. (CCH) 510; T.C.M. (RIA) 80216; June 24, 1980, Filed Robert E. Zang, for the petitioners. *366 Robert W. Towler, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge:[2] In these consolidated cases, respondent determined deficiencies and an addition to tax for 1972 in the following amounts: Addition to Tax
Docket No.
Petitioner
Deficiency
(sec. 6651(a)) [3]
5506-77
Estate of Eileen M.
$2,542.00
$636.00
Knudsen
5507-77
Alvin A. Janklow
1,091.68
0
and Phyllis Janklow
5508-77
Estate of Leslie R.
675.00
0
Grochau
5509-77
George F. Tondorf
2,635.76
0
and Peggy F. Tondorf
5510-77
William S. Simons
4,909.00
0
and Joanne Simons
Due to concessions by petitioners, the only substantive issue for decision is whether the gain realized by a limited partnership of which petitioners are partners on the sale of approximately 41 acres *367 of land to the City of Palo Alto is ordinary income or capital gain. FINDINGS OF FACT All of the petitioners in these consolidated cases are legal residents of California, and they filed their Federal income tax returns for 1972 with the Internal Revenue Service Center, Fresno, California. Petitioners were all members of a limited partnership called Country Club Associates (CCA), located in Palo Alto, California. CCA filed an amended partnership return for 1972 with the Internal Revenue Service. As stated in its certificate of limited partnership, the purpose for which CCA was formed on June 1, 1965, is as follows: [Purchasing], developing and selling for profit a parcel of land of approximately 56 acres presently owned by Peter Mullen, Ruth Mullen Graham and Jeanette Mullen Dyson, in the city of Palo Alto, county of Santa Clara, state of California, and any other lands the partners hereto may subsequently elect to purchase and develop. The certificate further provided that CCA would exist "until such time as the parcel of land or lands herein have been sold, or for a period of ten (10) years, whichever date shall first occur." William Gerald Dunn (Dunn), an engineer, *368 land developer, licensed real estate broker, and general contractor, obtained limited partners to invest in CCA and retained an attorney to draw up the partnership papers. Dunn performed extensive duties as an employee of CCA, such as acquiring land, hiring architects and engineers to design and develop the land, appearing before government bodies to obtain various permits and authorizations, working with the partnership attorney on legal questions, and incurring and paying legal obligations of the business. In 1965, UNKNOWN after negotiations with Dunn, Dan Dana (Dana), a land developer, assigned to CCA for $321,455 his contractual right to buy an undeveloped tract of land comprising 58.45 acres (the 58-acre tract) located in the lower foothills area of Palo Alto adjacent to the Palo Alto Hills Golf and Country Club (the country club). At that time, the zoning regulations of the City of Palo Alto (the City) designated this tract for minimum one-acre residential lots. CCA intended to develop the property from time to time in subdivisions containing lots of approximately that size. [5]
*369 While CCA developed the tract, the fee owners of the property, the Mullen family, retained legal title for security purposes. The fee owners released parcels of the land to CCA as it paid the $4,500 to $5,500 per acre price stated in the sales contract. Pursuant to that contract, CCA was obligated to pay all taxes on the property and to pay the Mullens quarterly interest on the gross purchase price of the land, whether or not it elected to pay that price. From the date of assignment, CCA was in continuous possession of the tract and treated it as its own without any interference from the fee owners. Before lots in a subdivision may be sold or leased, or offered for sale or lease, California law as in effect during all times relevant here, required that a final map be recorded or filed with the local governing authority, and that a public subdivision report be issued by the Real Estate Commissioner of the State of California. Cal. Bus. & Prof. Code secs. 11000, 11504, 11507, 11538, 11610 (West 1964); Cal. Bus. & Prof. Code sec. 11018.2 (West Supp. 1980). Filing of a tentative map is a prerequisite for recording or filing of a final map. If a final map is not recorded within *370 the period prescribed by ordinance, including any extensions, from approval or conditional approval of a tentative map, a new tentative map must be submitted. Cal. Bus. & Prof. Code secs. 11503, 11550, 11555 (as amended by 1965 Cal. Stats., c. 1180, p. 2985, sec. 12) (West 1964). On April 15, 1968, the City Council of Palo Alto (City Council) approved a tentative map filed by CCA for the entire 58-acre tract. CCA first proceeded with the design of subdivision improvements on an approximately 17.26-acre portion of the 58-acre tract (Unit No. 1). On November 12, 1968, the City Council approved a final map containing 12 residential lots which CCA filed for Unit No. 1.The California Department of Real Estate issued a public subdivision report covering Unit No. 1. On May 12, 1970, CCA recorded a grant deed from the fee owners of land constituting Unit No. 1 and the scattered parcels. All of the lots in Unit No. 1 were developed and sold during the period beginning on or about October 12, 1970, and ending on or about December 7, 1972, for a total price of $277,100. The cost of improvements per lot was $7,000 to $8,000. Between January 6, 1971, and January 3, 1973, CCA also sold *371 5 lots which had been acquired as surplus for the following amounts: $22,500; $22,430; unknown; $25,000; and $28,500. On their Federal income tax returns, CCA and its partners reported the gains realized from the sales of all these lots as ordinary income. Beginning in 1969, the City commissioned Livingston & Blayney, a land use planning consulting firm, to prepare a series of studies of the Palo Alto foothills area. The series was designed to assist the City in determining what type of development, if any, should be allowed in the undeveloped portions of that area. Approval of the prior tentative map for the 58-acre tract having expired, the City Council on December 8, 1969, approved a new tentative map which CCA filed and which covered the remaining 41 acres (Unit No. 2). On January 26, 1970, the City Council passed a motion providing that the Livingston & Blayney study include a study of permanent open space on lands to be acquired in order to protect the outlook from a proposed foothills park. Before June 1970, City officials also advised CCA that the City would consider taking measures to prevent further development of the foothills area, including, if necessary, downgrading *372 zoning, building moratoria, and direct condemnation action. In June 1970, Livingston & Blayney filed a third report with the City in which it recommended that the City purchase the land below the proposed foothills park, including the land owned by CCA; deny approval of all development proposals for such lands; purchase those lands when necessary to prevent development; downgrade the zoning of those lands to prevent further development prior to City acquisition; and undertake further studies of alternative ways to acquire those lands and of attendant costs. In November 1970, the City Council voted to accept the proposals in Livingston & Blayney's third report. City officials asked CCA to defer request for approval of proposed development of Unit No. 2 in order that the City have time to establish its policy with respect to property acquisition in the event that development was not to be permitted. On December 8, 1970, CCA submitted to the City improvement plans and a proposed final map covering Unit No. 2. At a February 8, 1971, meeting, the City Council approved, subject to specified conditions, the final subdivision plans filed by CCA for Unit No. 2. CCA was unable, however, *373 to obtain the signatures of the appropriate City officials to permit the map to be recorded. On February 22, 1971, the City Council passed a motion stating its firm policy decision to acquire the lands below the proposed foothills park for open space, park additions, and land banking purposes. At a meeting on May 24, 1971, the City Council passed a motion including Unit No. 2 within the boundaries of the lands below foothills park which it had designated for acquisition.Attending the latter meeting on behalf of CCA, Dunn stated that CCA did not oppose the City Council action but wished an early decision as to the manner of the acquisition and a fair price. During that meeting on May 24, 1971, Dunn also indicated that CCA's success in selling lots in Unit No. 1 had increased pressures to develop Unit No. 2 and that he was concerned that delays with respect to the City's financing program might prevent CCA from recording the final map for Unit No. 2, a map which had already received City approval.According to the minutes of the City Council meeting: City Manager Morgan pointed out that the Council has taken no action to impose a moratorium on these lands and California Lands' *374 [CCA's] final map for Unit #2 could be recorded at any time. He said in six months' time the City will know definitely which direction it is going to take, but it is doubtful that the money will actually be available in six months' time. The City will make every effort to alleviate the cloud under which the property owners find themselves and enable time to plan accordingly. Responding to a question from Mr. Dunn as to what staff's action would be if California Lands Company [CCA] submitted plans to the City Engineer next week, Mr. Morgan said Council has taken no action authorizing staff to delay plans, but if such plans were submitted staff would respond to Council as to the course of action to take based on discussions with the applicant. If staff is forced to act before the monies required for acquisition are available, they will have to ask Council to declare a moratorium. As to whether California Lands [CCA] could expect a commitment from the City within six months, indicating whether or not the lands in Unit #2 would be included in the take, Mr. Morgan replied that it would be the City's objective to include * * * Unit # 2 * * *. On July 19, 1971, the City adopted *375 Ordinance No. 2612 which established a 6-month moratorium on all development in the foothills area, including Unit No. 2. At a meeting of the City Council on or about February 14, 1972, Dunn asked that the City Council honor what he termed its May 1971 "commitment to provide an answer within six months." Dunn also told the Council that further extension of its moratorium on Unit No. 2 would cause CCA to become bankrupt. On or about February 16, 1972, CCA applied to the City for relief from the existing moratorium ordinance; if granted, such relief would have allowed CCA to develop Unit No. 2. The City denied CCA's application. On February 28, 1972, by Ordinance No. 2647, the City extended for a second 6-month period its moratorium on development in the area designated for acquisition. Pursuant to an agreement dated April 7, 1972, CCA granted the City an option to purchase Unit No. 2. As consideration for the option, the City paid $3,000, an amount which was to be credited against the $525,000 purchase price. The purchase price was based upon the land's value as property which had been approved for subdivision. On April 17, 1972, the City Council passed a motion which authorized *376 the mayor to negotiate the purchase of Unit No. 2 from CCA and, on April 18, 1972, the City exercised its option to purchase Unit No. 2. On May 15, 1972, the City Council approved on first reading Ordinance No. 2654, adding "Open-Space District Regulations" to the Palo Alto Municipal Code. The Ordinance, which was formally adopted in June 1972, required minimum 10-acre lot sizes for residential subdivision in the foothills area, including Unit No. 2. Another owner of foothills property, Arastra Limited Partnership, filed suit against the City, claiming that actions including passage of Ordinance No. 2654 constituted inverse condemnation of Arastra land. The decision in that case ( Arastra Limited Partnership v. City of Palo Alto,401 F.Supp. 962 (N.D. Cal. 1975)) was vacated and ordered expunged when the parties settled on July 1, 1976 (417 F.Supp. 1125 (N.D. Cal. 1976)). On May 24, 1972, the City purchased Unit No. 2 for the price specified in the option agreement. [6] At that time, Unit No. 2 was the only foothills property purchased by the City for open space. No physical improvements had been made to the tract. *377 On its 1972 partnership return, CCA reported the gain on the sale of Unit No. 2 as ordinary income. CCA subsequently filed an amended partnership return for 1972 in which it reported the $253,385 gain as long-term capital gain. Respondent reclassified the $253,385 long-term capital gain reported on CCA's amended partnership return for 1972 as ordinary income. Accordingly, respondent determined that the partnership had distributable net income of $190,314 rather than the ordinary loss of $63,071 claimed on the amended return. As the notices of deficiency issued to petitioners indicate, adjustments were then made to the individual income tax returns of the partners, reflecting an allocation of the redetermined partnership ordinary income based on the interests held by petitioners during 1972 as follows: *hPercentage
Interest
Partner
in CCA
Ordinary Income
Leslie R. Grochau [1] *378 18.750%
$ 35,683
Eileen M. Knudsen
6.250%
11,895
George F. Tondorf
6.250%
11,894
Alvin A. Janklow
6.250%
11,894
William S. Simons
15.625%
29,737
OPINION CCA, a limited partnership of which petitioners were partners, sold Unit No. 2, an undeveloped tract of approximately 41 acres, to the City on May 24, 1972. Arguing that CCA at all times held Unit No. 2 for sale to customers in the ordinary course of its business, respondent maintains that the gain realized on the sale is taxable as ordinary income. According to respondent, CCA voluntarily sold the tract only when it was able to obtain a development property price for that land from the City. Petitioners concede that CCA acquired unit No. 2 for sale to customers in the ordinary course of business. They maintain, however, that CCA was forced to abandon its original intent and to hold the tract as a capital asset when it became apparent that the City would prevent it from developing the tract as a residential subdivision. Accordingly, petitioners contend that the profit from the sale of Unit No. 2 is long-term capital gain from the sale or exchange of a capital asset. We agree with petitioners. In order to receive capital gain treatment under sections 1202 and 1222(3) and (11), the gain *379 must arise from the sale or exchange of a capital asset. [7]Section 1221 first defines the term "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)" and then excludes certain types of property from capital asset status. The first statutory exception covers in part: *380 (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; The purpose of this exception is to differentiate gains derived from the everyday operation of a business from those derived from appreciation in value over a substantial period of time. Malat v. Riddell,383 U.S. 569, 572 (1966). Whether a taxpayer holds property as a capital asset or for sale to customers in the ordinary course of business is a question of fact. Bauschard v. Commissioner,279 F.2d 115, 117 (6th Cir. 1960), affg. 31 T.C. 910 (1959); McManus v. Commissioner,65 T.C. 197, 211 (1975), affd. 583 F.2d 443 (9th Cir. 1978), cert. denied 440 U.S. 959 (1979). To decide whether a particular item is a capital asset, courts generally consider a number of factors, including: (1) the purpose for which the property was acquired and subsequently held; (2) the extent to which improvements were made to the property by the taxpayer; (3) the extent and nature of the taxpayer's *381 efforts to sell the property; (4) the number, extent, continuity, and substantiality of the sales; and (5) the proximity of sale to purchase of the property. Because the purpose for which a taxpayer holds property is subject to change, the issue turns on the purpose for which the property is held at the time of sale. Biedermann v. Commissioner,68 T.C. 1, 11 (1977); Maddux Construction Co. v. Commissioner,54 T.C. 1278, 1284 (1970); Eline Realty Co. v. Commissioner,35 T.C. 1, 5 (1960). After consideration of all the facts and circumstances of this particular case, we conclude that CCA held Unit No. 2 as a capital asset on April 7, 1972, when it granted the City an option to purchase the property. As petitioners concede, Unit No. 2 was purchased along with the remainder of the 28-acre tract to be subdivided and developed into residential lots for sale. Consistent with this original intent, CCA complied with California statutory prerequisites for sale of subdivision lots, filing a tentative map, which was approved on December 8, 1969, and a final map on December 8, 1970, which was approved on February 8, 1971. However, the *382 City gradually reached a decision that the foothills area, which encompassed Unit No. 2, should not be developed as a subdivision, and the appropriate City officials would not sign the approved map so that it could be recorded. The minutes of a City Council meeting on May 24, 1971, state that if the City staff were "forced to act" before the City had obtained the money required for the acquisition of the land, they would "ask council to declare a moratorium." Both before and after the May 24, 1971, meeting, the City took a series of steps which frustrated CCA's development of Unit No. 2 as a subdivision. At its February 22, 1971, meeting the City Council passed a motion adopting a firm policy to acquire the proposed foothills park for open space. Three months later, on May 24, 1971, the City Council passed a motion expressly including Unit No. 2 within its acquisition plans. Two months thereafter, on July 19, 1971, the City Council established a 6-month moratorium on development of the foothills area, including Unit No. 2. On February 16, 1972, CCA applied for relief from the moratorium ordinance, but relief was denied. Sometime after February 16, 1972, and before the April 7, 1972, grant *383 to the City of an option to purchase, CCA abandoned its original purpose for holding the property for sale to customers in the ordinary course of its business. According to Dunn's statement at the February 14, 1972, City Council meeting, a continued moratorium in development would bankrupt CCA. On February 28, 1972, the City Council nonetheless extended the moratorium a second 6 months. We believe that CCA could not afford to delay more than 6 months in developing Unit No. 2 for sale. Moreover, given the City's past actions, CCA could reasonably anticipate City opposition to continue beyond that period. Enforcing its rights against an uncooperative City might entail litigation. With the City steadily moving toward the acquisition of the property and forbidding development by the successive moratoria, it is difficult to see how CCA can be said, after February 28, 1972, to have held Unit No. 2 for sale to customers in the ordinary course of its business--a business it was forbidden to pursue. As Dunn testified, CCA believed it had two choices: One, to sue the city or two, to try to find somebody to buy it as is. And the only really likely source for that would be the City *384 themselves [sic]. The former course might have involved delays comparable to those experienced by the property owners in Arastra Limited Partnership v. City of Palo Alto,401 F.Supp. 962 (N.D. Cal. 1975), 417 F.Supp. 1125 (N.D. Cal. 1976), which was finally settled on July 1, 1976. With its precarious financial conditions, CCA chose the latter course. Compare Ridgewood Land Co. v. Commissioner,477 F.2d 135, 136 (5th Cir. 1973), affg. per curiam a Memorandum Opinion of this Court; Tri-S Corp. v. Commissioner,48 T.C. 316, 318 (1967), affd. on other grounds 400 F.2d 862 (10th Cir. 1968). [8]
Respondent relies on our decision in McManus v. Commissioner,65 T.C. at 215-216, in which we refused to hold that a condemnation or threat of condemnation changes a partnership's purpose for holding certain subdivided *385 and improved property. As this Court observed, various governmental authorities could use the land in its improved state. Since the taxpayer had already sold or attempted to sell to other governmental authorities, it recognized such entities as potential customers. The instant case is distinguishable from McManus. The City purchased Unit No. 2 for use not as a residential subdivision but rather for open space. Prior to the sale, CCA neither sold to nor negotiated with other governmental entities. Although respondent characterizes the City as a expected customer, as that term is used in McManus, we believe that CCA recognized the City as such not voluntarily but only because City actions frustrated and impeded the original plans to develop Unit No. 2. Respondent's attempt to distinguish the instant case from Biedermann v. Commissioner,supra, is unconvincing. In Biedermann, we found that the taxpayers held their lands as a capital asset at least from the time that Baltimore County officials refused to allow them to develop the lands. Respondent attempts to differentiate Biedermann since: (1) the Biedermann taxpayers managed their own *386 lands whereas Unit No. 2 was managed not by petitioners but by the partnership, through an engineer-land developer; (2) the two tracts were sold 15 and 9 years, respectively, after purchase whereas Unit No. 2 was sold approximately 6 to 7 years after acquisition; and (3) those taxpayers were prevented by county officials from developing their tracts while CCA voluntarily sold Unit No. 2 to the City. To support his view that the sale was voluntary in this case, respondent argues that after the City Council approved the final map on February 8, 1971, all steps required by California statute could be taken without City approval. Cal. Bus. & Prof. Code secs. 11610, 11614 (West 1964). Therefore, CCA could, in respondent's view, have chosen to proceed with development when the second moratorium expired. The first two points are, we believe, without legal significance. We also reject respondent's argument that the sale to the City was a matter of CCA's free choice.Although the City Council had formally approved the development plan, the City staff opposed development of Unit No. 2. The refusal of the appropriate City officials to sign the plan, as a practical matter, was a roadblock. *387 Even if respondent is correct in his view of the status of Unit No. 2 under California law, CCA could have enforced its rights against City opposition only through a lawsuit. In other words, CCA could pursue "the ordinary course of its business" only by litigating for the right to do so. As we have discussed above, we believe that after February 16, 1972, CCA, finding itself in this position, changed the purpose for which it held the property. It no longer held the property "for sale to customers" in the ordinary course of its business. It sold the land to the City because it could not afford the uncertainties and the delays which a lawsuit would have entailed. Citing Lawrie v. Commissioner,36 T.C. 1117 (1961), and Bruning v. United States,273 F.Supp. 349 (M.D. Fla. 1967), [9] respondent argues that the fact that land is sold in bulk or in unsubdivided parcels is not, in and of itself, a ground for granting capital gain treatment to a sale. As our discussion indicates, we have no so held. Moreover, in the cases upon which respondent relies, the courts found that, at the time of sale, the land was held by the taxpayer for sale to customers *388 in the ordinary course of the taxpayer's trade or business. Lawrie v. Commissioner,supra at 1120; Bruning v. United States,supra at 352. [10]
Petitioners also maintain that they are entitled to attorneys' fees under 42 U.S.C. sec. 1988. As they acknowledge, we have held that provision inapplicable to Tax Court proceedings. Key Buick Co. v. Commissioner,68 T.C. 178 (1977), affd. 613 F.2d 1306 (5th Cir. 1980). Petitioners have put forward no substantial reason why we should reconsider that holding and we decline to do so. To reflect the foregoing, Decisions will be entered under Rule 155 in docket Nos. 5506-77 and 5509-77.
Decisions will be entered for the petitioners in docket Nos. 5507-77, 5508-77, and 5510-77.
Footnotes
1. The following cases are consolidated herewith: Alvin A. Janklow and Phyllis Janklow, dkt. No. 5507-77, Estate of Leslie R. Grochau, Deceased, Ruby W. Grochau, Executrix and Ruby W. Grochau, Surviving Wife, dkt. No. 5508-77; George F. Tondorf and Peggy F. Tondorf, dkt. No. 5509-77; and William S. Simons and Joanne Simons, dkt. No. 5510-77.↩
2. This case was tried before Judge William H. Quealy↩ who subsequently resigned from the Court. By order dated June 24, 1980, the case was reassigned for disposition.
3. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.↩
UNKNOWN. Although the parties have stipulated that the tract was acquired in 1965, Dunn testified that the assignment occurred approximately in 1966. It appears from CCA's amended partnership return for 1972 that a 41-acre portion of the tract was acquired in Jan. 1967. ↩
5. Dana also assigned to CCA and CCA exercised a right of first refusal on scattered parcels declared as surplus by the country club.↩
6. Although the parties stipulate that May 24, 1972, was the date of purchase, City Manager George A. Sipel testified that the City paid the balance of $522,000 on May 18, 1972.↩
1. Leslie R. Grochau and Ruby W. Grochau held their partnership interest as community property, as did petitioners Alvin A. Janklow and Phyllis Janklow and William S. Simons and Joanne Simons.
7. In the instant case, the parties have stipulated that CCA held Unit No. 2 for more than 6 months before its sale to the City. The parties have not, therefore, raised the issue whether CCA's holding of the equitable title to Unit No. 2 for more than 6 months and its acquisition of legal title to the tract on the date of sale constitutes a sufficient holding period for purposes of sec. 1222(3).We note, however, that CCA paid taxes on Unit No. 2 and had continuous possession of that tract without interference from the fee owners for approximately 6 years between the time it acquired equitable title to the property and the date it sold the property to the city. See, e.g., Merrill v. Commissioner,40 T.C. 66, 71 (1963), affd. per curiam 336 F.2d 771↩ (9th Cir. 1964).
8. In the context of the development moratoria, factors such as the extent of improvements, and of sales activity, frequency of sales, and proximity of sale to purchase are of reduced significance. Accord Eline Realty Co. v. Commissioner,35 T.C. 1, 6↩ (1960).
9. Maxine Development Co. v. Commissioner,T.C. Memo. 1963-300; Dantagnan v. Commissioner,T.C. Memo. 1960-144↩. 10. Another case cited by respondent is also distinguishable on this ground. Westchester Development Co. v. Commissioner,63 T.C. 198, 209-210↩ (1974).